**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward A. GREER and Alphonse P. Bartkus, Defendants-Appellants.**

**Nos. 18583, 18584.**

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1972.

Decided Aug. 18, 1972.

Rehearing Denied Nov. 6, 1972.

---

Robert S. Bailey, Richard H. Devine, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gordon B. Nash, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and KILEY and PELL, Circuit Judges.

SWYGERT, Chief Judge.

This is an appeal from the conviction of two defendants arising out of the theft of 40,400 pounds of copper from an interstate freight depot in Greenfield, Indiana. Defendants Edward A. Greer and Alphonse P. Bartkus were each named in two counts of the four-count indictment. Count One charged the defendants, four codefendants, and three named but unindicted coconspirators, with participation in a conspiracy having three unlawful objectives—stealing from an interstate shipment of copper in violation of 18 U.S.C. § 659, transportation of the cargo in interstate commerce in violation of 18 U.S.C. § 2314, and concealing the stolen cargo in violation of 18 U.S.C. § 2315. Count

Two charged Greer and two codefendants with the substantive violation of 18 U.S.C. § 2314, transporting copper from Greenfield to Chicago knowing it to have been stolen. Count Three charged Bartkus and one other codefendant with concealing and disposing of cargo they knew to have been stolen in derogation of 18 U.S.C. § 2315. Only Bartkus and Greer proceeded to trial since three codefendants entered pleas of guilty and another was granted a severance on motion of the Government. Both defendants were found guilty by the jury as charged. Post-trial motions were denied and each was sentenced to the custody of the Attorney General for concurrent terms of five years.

Greer contests the sufficiency of the evidence to sustain his conviction under Counts One and Two, the constitutional propriety of venue for Count Two in the Northern District of Illinois, and cites several trial errors stemming from the prosecutor's conduct and the joinder of Greer's case with that of Bartkus. Bartkus joins in Greer's challenges "where applicable" and additionally charges error arising from the prosecutor's closing remarks.

A brief outline of the evidence is in order. The principal witness for the Government was Ellis Young, an unindicted coconspirator. Young testified that while at home in Chicago in June 1966 he received a phone call from Greer in which Greer stated that he "had something" for Young. Young, joined by Phillip Kurtz and Thomas Harty, two codefendants, and Robert Harty, an unindicted coconspirator, drove from Chicago to Greer's home in Carmel, Indiana. Young related Greer's statement: "He told me he had a little copper, the driver was broken down and had transmission trouble, and that we would have three days with the load, if we could handle it." Greer further described the load of copper and its location.

Young, the Hartys, and Kurtz proceeded to Indianapolis where they stole a tractor from B & M Leasing Company for use in the theft of the copper. After stealing the copper from a disabled trailer in the Daniels Motor Freight Terminal in Greenfield, they drove to Chicago. In Chicago, they were met by John Carrino, another codefendant, who led them to the warehouse space he had rented. Since they were unable to unload all the copper, Young contacted Frank Nitti, an unindicted coconspirator, to arrange for the disposition of the remaining portion. Nitti reported to Young that he would store the copper in the garage of Samuel Tobias, a codefendant. When Tobias' garage proved to be too small, the stolen truck and trailer were sent to another location in Chicago where they were recovered by Federal Bureau of Investigation agents.

Young also related two phone conversations with Greer after the theft had occurred. He stated that Greer called him to inquire where the money from the sale of the copper was being kept. He then described calling Greer to arrange a meeting for the purpose of distributing the proceeds. According to Young, however, Greer never appeared to claim his share.

The Government also called Carrino to testify as to the renting of the warehouse and the sale of the copper remaining in the warehouse. He implicated Alphonse Bartkus by describing Bartkus' role in finding a place to store the copper.[1] He also described a subsequent conversation with Young in which he informed Young that the load was "hot," that he had been forced by Bartkus to have it removed, and that Bartkus had been instrumental in its disposition.

The remainder of the Government's case consisted of witnesses who described the interstate character of the copper shipment, its point of origin, its destination, and its value. Allen Hercamp, a truck driver employed by the

---

1. This was corroborated by the testimony of an officer of the association that owned the building in which the load was stored.

Daniels Motor Freight Company, testified to carrying a load of copper belonging to Revere Copper and Brass, Inc. from Rome, New York, destined for St. Louis. Repairs to his truck necessitated stopping in Greenfield on June 27, 1966 and storing the trailer containing the copper in the local Daniels terminal. Hercamp testified that he next saw the trailer in Cicero, Illinois, at which time most of its load was missing.

Counsel for Bartkus presented no witnesses on Bartkus' behalf. Greer offered several witnesses who testified to his presence in Florida when the offense was committed. Morris Evans stated that in June 1966 several men visited Greer's Carmel home, including a man nicknamed "Rebel," which was Young's nickname, while Greer was away and Evans was temporarily living there. According to Evans, when Greer returned from Florida he called Young in Chicago to express his disapproval of Young's visits to his home in his absence. Greer also took the stand and described his first meeting with Young when both were incarcerated in the federal penitentiary in Terre Haute and a later meeting in Greer's home on Memorial Day in 1966. He then related the details of his stay in Florida between June 16 and July 6, 1966.[2] In addition, Clyde Smith, the manager of the Daniels terminal in Greenfield was called to the stand and, though he admitted knowing Greer, denied having told anyone about the location or contents of the shipment.

## I

■ Greer claims that this evidence is insufficient to support the substantive charge in Count Two of the indictment that he "did transport and cause to be transported in interstate commerce" 40,400 pounds of copper which he knew to have been stolen. The Government's theory is that Greer aided and abetted in the transportation of the copper and, as such, under 18 U.S.C. §

2, is liable as a principal for the offense. According to the defense, the evidence supports only a charge of aiding and abetting the copper's theft, but not aiding and abetting transportation of the copper; lacking proof that Greer knew of the thieves' plans for the interstate conveyance of the copper, the Government may not charge him with complicity in its transportation. The Government's position is that an "aider and abettor" is responsible not only for the immediate acts he facilitates, but also for the other likely consequences of his acts. Since transportation of the stolen goods was a foreseeable consequence of their theft, the Government need not show specific intent to aid in this act. In addition, the Government maintains that knowledge of the interstate component of a criminal act is never a prerequisite to a finding of criminal liability.

We think the Government's standard for one who aids and abets a crime far too broad. Congress specifically provided for three separate crimes: theft of goods which were in interstate commerce (18 U.S.C. § 659), the transportation of stolen goods in interstate commerce (18 U.S.C. § 2314), and the knowing sale of such goods (18 U.S.C. § 2315). Since transportation and disposition of stolen goods are always "likely" consequences of their theft, the Government's standard effectively obliterates these distinctions. No matter what a defendant's participation was in the initial theft, he becomes responsible for all subsequent "likely" stages. Under this approach, the cumulation of punishments will always be an important danger.

■ Moreover, the Government's standard contradicts the prevailing case law on aiding and abetting. The seminal case is United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938), in which Judge Learned Hand states that aiding and abetting requires that the defend-

2. One of Greer's witnesses, Carl Miller, testified to being with Greer in Florida during part of this period.

ant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." [3] This suggests two general components of aiding and abetting —an act on the part of a defendant which contributes to the execution of a crime and the intent to aid in its commission. Analysis is complicated, however, where there is an extended course of criminal conduct and where, though the defendant's participation is limited to one stage, he is charged with aiding and abetting a subsequent one. We must then consider how far accomplice liability can be extended to include crimes other than the one (or ones) the accomplice immediately aided.

 Accomplice liability is necessarily limited by the general principles of criminal liability. To allow a jury to infer an intent to aid in the commission of one offense from the demonstrated intent to aid in another earlier offense because the later crime is a foreseeable consequence of the earlier one, is to base criminal liability only on a showing of negligence rather than criminal intent. Model Penal Code § 2.04, Comment (Tent. Draft No. 1, 1953). The court will relax the intent component of aiding and abetting in a limited number of situations. We agree, for instance, that a defendant can be held responsible as an aider and abettor of a crime even where there is no direct proof that he intended to aid in the crime, if he is substantially involved in

the chain of events leading immediately to it. Thus, the driver of a "getaway" car during a robbery who intends only to aid in the theft, can be charged with the crime of transporting the stolen goods although his participation in the subsequent transportation was inadvertent. The requisite intent may be inferred when the defendant's physical participation in the course of events is substantial. [4] But where the relationship between the defendant's acts and the ultimate crime for which he is charged is as attenuated as it is in the instant case, we would require some showing of specific intent to aid in, or specific knowledge of, the crime charged.

 Greer's participation was limited to triggering the theft by providing the thieves with information about the copper. Young testified that Greer alerted him to the existence of the copper, described its location, and later, after the theft, phoned him in order to claim the proceeds. Since the Government does not claim Greer was physically present at the crime, Greer's participation amounts to that of an "accessory before the fact." [5] As such, in order to prove Greer's complicity with the later stages of the crime—namely, the transportation of the goods—the Government must show that he intended to aid in post-theft plans, or that he knew details of the thieves' travel plans, such as the specific destination of the goods. Since the Government made no such showing, we find the proof insufficient to sustain a conviction on this count.[6]

---

3. See United States v. Varelli, 407 F.2d 735 (7th Cir. 1969); United States v. Turnipseed, 272 F.2d 106 (7th Cir. 1959).

4. There are two additional situations in which the intent requirement for accomplice liability is relaxed, the felony-murder and misdemeanor-manslaughter situations. Aiding in the commission of a felony which results in an unintended death subjects the accomplice to liability for murder.

5. 18 U.S.C. § 2 abolished the differentials in punishment that resulted from characterizing a defendant as an accessory

before or after the fact, or as a principal. The common law characterizations are useful, however, in determining when a defendant's participation is sufficient to make him an accomplice and thus to require the application of this section. United States v. Pritchard, 55 F.Supp. 201 (W.D.S.C.), aff'd, Waters v. United States, 145 F.2d 240 (4th Cir. 1944).

6. Since we are overturning Greer's conviction under Count Two, we need not reach his argument on the constitutional impropriety of venue in the Northern District of Illinois under that count.

## II

Greer also argues that the evidence is insufficient to sustain his conviction under Count One, the conspiracy count. He maintains that Count One charges multiple conspiracies since it includes "subsequent receivers" of stolen goods, and since it alleges as one of the objects of the conspiracy the transportation of the goods in interstate commerce. Greer contends that the only conspiracy with which he could have been charged is one whose sole object was the theft of the copper, and whose sole participants were himself and the four codefendants directly involved in the theft.

The claim that Greer had no "connection" with four of his alleged coconspirators does not, by itself, sustain the charge of multiple conspiracies. Conspiracy law does not require a direct connection with all coconspirators in the sense of person-to-person communication, or even specific knowledge of their identities. Once the "essential nature of the plan" is discovered, and the defendant's adherence to it shown, ignorance of some of the participants in that plan does not relieve the defendant of liability. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). The rule has its most cogent restatement in United States v. Andolschek, 142 F.2d 503, 507 (2d Cir. 1944):

> It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them. Nevertheless, he must be aware of those purposes, must accept them and their implication, if he is to be charged with what others may do in execution of them.

*Accord,* United States v. Battaglia, 394 F.2d 304, 311 (7th Cir. 1968), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). Knowledge of additional participants is inferred from the nature of the plan to which the defendant has consented.

This is the case even in so-called "chain conspiracies" in which participants who may not know precisely of each other's existence perform different activities in sequence. *See, e. g.,* Note, Federal Treatment of Multiple Conspiracies, 57 Col.L.Rev. 390 (1957). Thus, in United States v. Bruno, 105 F.2d 921 (2d Cir.), rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939), where the court found the common plan required the participation of additional parties, the defendant was held to be part of a single conspiracy composed of smugglers of narcotics, several middlemen, and two groups of retailers. *See also,* Blumenthal v. United States, *supra.* Greer, however, points to cases in which courts have hesitated to characterize ultimate purchasers or sellers of stolen goods as conspirators with those immediately involved in the criminal venture. United States v. Braico, 422 F.2d 543 (7th Cir.), cert. denied, 398 U.S. 912, 90 S.Ct. 1712, 26 L.Ed.2d 74 (1970); United States v. Ford, 324 F. 2d 950 (7th Cir. 1963). The instant case, we believe, presents no such difficulties. Those participants whom Greer calls "subsequent receivers" were far more involved in the entire undertaking than were the buyers in *Braico* and *Ford* whose responsibilities began and ended with the exchange of money for goods. Since a trailer filled with 40,400 pounds of copper was involved here, disposition required elaborate arrangements and a great deal of contact with the principal thieves. Moreover, the difficulties of finding complicity between those at the end of the chain and those immediately involved in the venture, may not apply as between those at the beginning of the chain, who may be characterized as instigators of the plot, and subsequent participants. Greer's argument, which is the apparent converse of *Braico* and *Ford,* is deficient since the instigator of a chain could readily fall within the rule of *Andol-*

*schek* as one who "embarks upon a criminal venture of indefinite outline." 142 F.2d at 507.

The fundamental question is what the defendant assented to and whether that assent can be construed as including subsequent participants and their activities. This kind of analysis is simplified where the conspiracy alleged focuses only on a single object as in Blumenthal v. United States, *supra.* However, a conspiracy with multiple objects and multiple parties can also be held to constitute a single conspiracy as long as the objects are integrally related, such that "the success of that part with which [the defendant] was immediately concerned, was dependent upon the success of the whole." United States v. Bruno, 105 F.2d at 922. *Cf.* Kotteakos v. United States, 328 U.S. 750, 768, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[7] In the instant case, the objects of the conspiracy—theft, transportation, and disposition—are indispensable to the success of the entire venture. As we have indicated, theft of 40,400 pounds of copper required planning and cooperation; each "link" in the scheme must have assumed that the unlawful venture could not stop with their task alone. Thus we infer consent to the later, indispensable stages from Greer's consent to the preliminary ones.

On the face of it, this seems inconsistent with our analysis of aiding and abetting. We have stated that while Greer is liable as a conspirator to steal, transport, and dispose of the copper, his liability as an accomplice can extend only to the theft. However, this apparent inconsistency is resolved when the nature of conspiracy law is analyzed. The nub of a conspiracy is agreement. Conspiracy, it is suggested, is more than a species of inchoate crime; conspirators are held liable for setting up a structure which becomes the continuing focal point for crimes. Society adjudges itself harmed not only by the attainment of the unlawful objectives of the conspiracy but by the conspiracy's very existence which the law regards as making attainment of unlawful objectives more likely than in the case of individual action. Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920 (1959). Hence, we may infer agreement to transport and dispose of the copper from complicity in a structure that readily led to that end where we do not infer intent to commit the same substantive crimes.[8] Though there are definite and important limits to a conspirator's liability, *see, e. g.*, Kotteakos v. United States, *supra* 328 U.S. at 773, 66 S.Ct. 1239, that liability is not as circumscribed as the liability of an accomplice.[9]

In addition, Greer attacks the validity of his conviction under Count One based on the Government's failure to show that the defendant knew of the "interstate character of the copper ship-

---

7. In United States v. Battaglia, 394 F.2d 304 (7th Cir. 1968), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971), the dissent was based upon the belief that the two objects of the conspiracy, fraud and extortion, were not integrally related. The dissent found that the defendant could be held to have consented only to fraud, while extortion was a product of the individual initiative of a codefendant.

8. Our holding would be different, however, if Greer were charged with participation in a conspiracy whose sole object was the transportation of the copper or its disposition. Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920,

939 (1959); Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893); Fulbright v. United States, 91 F.2d 210 (8th Cir. 1937). The distinction made is between a general conspiracy with myriad objects, some of which the defendant was directly involved in, and a specific conspiracy to commit a particular substantive offense.

9. While this interpretation does make it more likely that defendants will be charged with conspiracies to violate all three sections of the Act, that consequence is less severe where the punishment is levied for participation in a single conspiracy rather than for participation in three separate substantive crimes.

ment" or was aware of its subsequent interstate transportation. While Greer concedes that knowledge of the interstate component of the crime is not a necessary element of the substantive crime charged, he suggests a different standard for conspiracy. We find no support for this position in the opinions of this circuit. In United States v. Pranno, 385 F.2d 387, 389 (7th Cir. 1967), cert. denied, 390 U.S. 944, 88 S. Ct. 1028, 19 L.Ed.2d 1132 (1968), the court stated: "All that must be proved . . . is that defendants conspired to commit extortion, and that the natural effect of carrying out their threat, whether they were conscious of it or not, would affect commerce." *See* United States v. Battaglia, *supra*. The holding of the Supreme Court in In re Coy, 127 U.S. 731, 8 S.Ct. 1263, 32 L.Ed. 274 (1888), and dicta in Screws v. United States, 325 U.S. 91, 106, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), suggest the same conclusion. *See* Developments in the Law—Criminal Conspiracy, *supra* at 937.

### III

We turn now to the trial errors alleged by both defendants, Greer and Bartkus. We find the claim of misjoinder of the trials of Greer and Bartkus to be without merit. Greer's argument that most of the evidence introduced at trial dealt with matters with which he had "no connection whatever" is rooted in his attack on the conspiracy count, an attack we have not sustained. In any event, under the standards of United States v. Tanner, 471 F.2d 128 (7th Cir. 1972), more must be proved if the defendant is to meet his burden of demonstrating prejudice.

In addition, Greer points to several instances of alleged prosecutor misconduct. He notes statements made by the prosecutor in which he used the pronoun, "I." While we have repeatedly underscored the prosecutor's responsibility for keeping his personal opinion out of the proceedings, reversal is not automatic upon appearance of the pronoun, "I." Upon examination it appears that in each statement the prosecutor was only restating the Government's theory of impeachment as to the particular witness involved. There was no suggestion of personal knowledge above and beyond the evidence before the jury. Greer also cites the prosecutor's comment about the testimony of Clyde Smith, "Isn't it possible that we didn't believe Clyde Smith?" The defense, however, invited that response by specifically charging that the Government did not call Smith because they knew he would not implicate Greer. *See* Lawn v. United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1957).

In addition, Greer alleges misconduct when, at the conclusion of the defense, the prosecutor requested, in the presence of the jury, a continuance "to get a witness to fly up here from Ft. Meyer, Florida." The judge turned down the request and required that all rebuttal testimony be concluded that day. Greer maintains that the request was a ploy on the part of the prosecutor who, having only discovered Greer's Florida alibi that afternoon, could not have had time to find a rebuttal witness in Florida. If the defense had shown positively that there was no such witness at the time the request was made, or if the Government had so conceded, the prosecutor's remarks would clearly warrant reversal. However, we cannot assume duplicity on the part of the Government solely on the strength of Greer's charges. Since no such showing was made, we cannot sustain a finding of misconduct.

### IV

Finally, Bartkus claims that the prosecutor erred by commenting on his failure to take the stand in violation of 18 U.S.C. § 3481 and the fifth amendment. The Government answers that Bartkus' attorney invited such comment in his own closing remarks and that, in any event, the record of this case sug-

gests that whatever misconduct took place in this regard was "harmless." Bartkus' attorney had stated:

Now as His Honor told you, it is up to those who bring the accusation to prove that accusation beyond a reasonable doubt. It is not for the defendant to prove anything. Certainly not for a defendant in this country to have to prove his innocence, and so in any criminal case it becomes, at the end of the case, not the defendant's, but his lawyer's decision as to whether or not he testifies. That is my decision in this case.

During the prosecutor's closing remarks the following colloquy occurred:

Mr. Cagney: Mr. Maloney told you, ladies and gentlemen, and he told you what ostensibly his reasons were. But I say to you you were not bound to what he told you.

There are other considerations that enter an attorney's mind why the man might not testify.

Mr. Maloney: I again want to object, for the record, your Honor.

The Court: Overruled.

We do not agree that the remarks of Bartkus' attorney justified the prosecutor's response. The defense counsel was doing no more than attempting to discount the natural, though impermissible, inferences of guilt that juries draw from a defendant's failure to take the stand. He restated the relevant law—that the burden of proof is on the prosecution, that the defendant need not come forth with evidence until the prosecution meets that burden—and then implied that as a result there were technical reasons for a defendant's failure to testify which a lawyer must consider. Under these circumstances, the rule that an advocate may by his comments invite a response from his opponent in an area ordinarily outside the purview of the closing remarks is inapplicable. *See* United States v. Guajardo-Melendez, 401 F.2d 35 (7th Cir. 1968). Certainly we cannot legitimize what in other instances would be prosecutorial misconduct because the

defendant chose to reiterate the law relating to a defendant's failure to testify. Of course, our analysis would be different if the defense counsel's remarks could be interpreted as advancing specific reasons for his client's failure to testify or as implying that the defendant wanted to testify but was prevented from doing so by his attorney. But we find that neither interpretation is warranted by the defense counsel's statements.

If the prosecutor had limited his response to the remark that the jurors "were not bound to what he [Bartkus' attorney] told you," we would have found no error. That remark was innocuous since it was apparently directed more to the attorney's credibility than to the defendant's actions. However, the prosecutor's second statement, that "[t]here are other considerations that enter an attorney's mind why the man might not testify," does amount to a suggestion—albeit a vague one—that the attorney's trial tactics were prompted by the defendant's guilt. Impermissible prosecutorial comment has been quite broadly defined. "[W]hether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Hayes v. United States, 368 F.2d 814, 816 (9th Cir. 1966). Though the question is a close one, we hold that the prosecutor's remarks are improper.

Ordinarily this violation is a serious one and warrants reversal. *See, e. g.,* Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, rehearing denied, 381 U.S. 957, 85 S.Ct. 1797, 14 L. Ed.2d 730 (1965); United States v. Ward, 168 F.2d 226 (3d Cir. 1948). However, we agree with the Government that in this instance the prosecutor's error was harmless beyond a reasonable doubt under the rule of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967). Bartkus' attorney requested and obtained adequate curative instructions from the trial judge. Moreover, a review of the record indicates

that the case against Bartkus was overwhelming.

Accordingly, we affirm Bartkus' conviction under Counts One and Three of the indictment. We also affirm Greer's conviction for conspiracy under Count One, but reverse his conviction for aiding and abetting under Count Two.[10]

PELL, Circuit Judge (concurring).

I concur in and approve of Chief Judge Swygert's opinion with the exception of part IV thereof as to which I concur that if there had been error it was harmless, but respectfully I cannot concur that the prosecutor's challenged remarks were erroneous.

I do not read the remarks of Bartkus' attorney as does Judge Swygert. I fail to find any indication in the remarks that there were technical reasons for the defendant's failure to testify which his lawyer had to consider.

It is stated in Judge Swygert's opinion that the attorney restated the relevant law—"that the burden of proof is on the prosecution, that the defendant need not come forth with evidence until the prosecution meets that burden."

However, aside from the question of whether there is ever any need (other than practical ones) for a defendant to come forth with evidence, the remarks only say that the burden of proof beyond a reasonable doubt is on the prosecution and the defendant does not have to prove anything including his innocence. If counsel had stopped there I could not find he had opened any doors to prosecutorial comment.

He did not stop, however, but switched from the matter of burden of proof to who made the decision as to whether the defendant would testify. I read in this a clear message to the jury to the effect that Bartkus was willing

but his attorney was not and therefore he did not testify. The next reasonable step of the inferential process in the jury's minds would be that the defendant could have testified to his innocence but that he was not permitted to do so by his lawyer as it "is not for the defendant to prove anything."

I do not find the prosecutor's statement entirely responsive to defense counsel's remarks as defense counsel did not really tell the "jury what ostensibly his reasons were." This part of his remarks, however, is apparently found to be innocuous.

The challenge is to that part to the effect that there were other considerations that enter an attorney's mind "why the man might not testify." It appears to me that when the defense counsel states in effect, "I did not let him testify," leaving open as he did here the implication that the defendant otherwise might have testified, the prosecutor is not entering an area of impropriety in the general remark concerning "other considerations."

I have expressed my opinion herein notwithstanding the fact that I am concurring in the result on this particular matter, as I feel it is unfortunate to put the stamp of approval of this court on the remarks of the defense counsel since similar remarks with the implications I see therein may well be made in cases where liability is a close question. The decision here would preclude the prosecutor from responding, thus leaving an improper implication unchallenged.

Here both attorneys used general language and the implications in the remarks of each were equally vague. I would hold that the prosecutor's remarks were clearly invited and that the acceptance did not exceed the bounds of the invitation.

10. Even though Greer was sentenced to concurrent terms on the two counts, we do not think that either resentencing or retrial on the remaining valid count is warranted under the standards articulated in United States v. Tanner, 471 F.2d 128 (7th Cir. 1972).