**UNITED STATES of America,
Appellee,**

v.

**Louis CIRILLO, Defendant-Appellant.**

**No. 298, Docket 72–1618.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1972.

Decided Nov. 6, 1972.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y. (Arthur J. Viviani, Dean C. Rohrer, and Peter F. Rient, New York City, of counsel), for appellee.

Albert J. Krieger, New York City, for defendant-appellant.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This appeal, from a judgment of conviction for violation of federal narcotics laws, takes us on a voyage of international intrigue. Events in France, Canada, and the United States provide the factual context against which we are asked to decide whether Louis Cirillo's two count conviction for conspiracy to import, possess with intent to distribute, and distribute narcotics; 21 U.S.C. §§ 846 and 963, and for the substantive offense of possession of heroin, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(2), and 18 U.S.C. § 2, may stand. We hold that it may and affirm the conviction.[1]

■ Since the critical inquiry in any conspiracy case involves a determination of the "kind of agreement or understanding [that] existed as to each defendant . . . as he understood it," United States v. Bennett, 409 F.2d 888, 893 (2d Cir.), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); see also, United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), it is profitable at this juncture to recount the dramatic facts of this case.

The Government's proof[2] relied principally on the testimony of a Frenchman, Roger Preiss, a named, but not indicted, co-conspirator.[3] His role in this saga, as he himself described it, was that of "go-between" for French sellers of heroin and for their American buyer. As a party to all conferences and transactions connected with the conspiracy, Preiss was ideally suited to play the role of Greek chorus and narrator of the events in question. His testimony embraced two transactions, one in August, 1971, and another in September and October, 1971; we adopt this division here for descriptive purposes.

*The August Transaction*

The evidence revealed a daring plan to smuggle 83 kilograms of pure heroin in-

1. Cirillo was indicted on March 17, 1972. He was tried before Judge Weinfeld and a jury, and a judgment of conviction on both counts was entered on May 25, 1972. Cirillo, a prior federal narcotics offender, was sentenced to concurrent 25 year terms of imprisonment to be followed by concurrent special parole terms of 6 years.

2. The defense called no witnesses.

3. Cirillo was the only conspirator to be charged as a defendant. In addition to Preiss, the following persons were named as co-conspirators but not as defendants: John Astuto, Richard Berdin, Antoine Grisoni, Andre Labay, Andre Lajoux, Michel Mastantuono and Joseph Signoli.

to the United States by hiding the narcotics behind and beneath the panels and floor board of an automobile, destined to be shipped from France to Canada and from there brought across the border into America. This ingenious, albeit misguided, scheme was the brainchild of a quartet of Frenchmen: Joseph Signoli, the principal seller; Andre Labay, a smuggler; Richard Berdin, a contact man; and Roger Preiss, a close friend of Berdin's. Berdin recruited Preiss to accompany Signoli on a trip to the United States, there to receive and deliver the heroin to Signoli's American buyer.

Preliminary arrangements in Paris occupied the participants' time through much of late spring and the early summer of 1971. By August 10, however, armed with fraudulent passports acquired from a Pigalle hairdresser, Preiss and Signoli departed by train for Frankfurt, Germany. En route, Signoli gave Preiss $2,000 and two telephone numbers and addresses, said to belong to Signoli's buyer. As the government's proof later showed, the numbers and addresses referred to apartments in Miami and New York used by the appellant, Louis Cirillo.

From Frankfurt, Preiss—travelling under the name Patrick Lorentz—and Signoli—adopting the alias, Yvon Tournied—flew to Montreal where they were met by Michel Mastantuono and his fiancee. After two days in Montreal—to what end the record does not make clear —Preiss, on Signoli's instructions, flew to Miami, where he was joined by Signoli the following day, August 14. Signoli immediately made plans to meet with Cirillo later in the afternoon. Although Preiss was not present at that meeting, while strolling about the city he observed Signoli and Cirillo seated at a table in a Howard Johnson restaurant. Later, Preiss informed Signoli that he had seen Signoli with the American buyer. Signoli then told Preiss that the addresses and telephone numbers he had been given on the train to Frankfurt were Cirillo's. Preiss was told he would

soon meet Cirillo and he was cautioned not to mention to Cirillo that he had Cirillo's telephone number.

Shortly thereafter, on August 15, or 16, Preiss did meet with Cirillo. A rendezvous was scheduled for a restaurant in Miami, where Signoli, Preiss, Cirillo and John Astuto, Cirillo's aide, assembled. Signoli introduced Preiss as his "future representative . . . in the United States," and said that Preiss would remain in America for six months. Cirillo, in turn, introduced Astuto to Preiss as a contact man, saying, "when you need to see me, you have any problem for the drugs, you know, in the future, you see this man," pointing to Astuto. A short while later, the four men left the restaurant and went to Cirillo's Miami apartment. There it was agreed that Cirillo would pay $10,500 per kilogram of heroin, with delivery scheduled for New York within the week.

The scheme continued to work smoothly as the conspiratorial group moved north. Preiss and Signoli flew to New York on August 20 and met briefly with Astuto. A day or two later, Mastantuono, the Montreal connection, met with Signoli, Preiss and an unidentified man from Marseilles, in front of St. Patrick's Cathedral on 5th Avenue, and identified a red car parked on the street as the vehicle that had been brought from Canada carrying the drugs. At a coffee shop nearby, Signoli and Preiss then met briefly with Cirillo and Astuto. Signoli told Cirillo that there were no problems and that "everything is okay."

The following morning, August 22, at 7:30 A.M., Preiss, Signoli, Astuto, Mastantuono, and the man from Marseilles, drove the car with narcotics to a home in Fort Lee, New Jersey, where the car was placed in the garage. During the next four hours the car was torn apart. With the aid of diagrams produced by Mastantuono, the conspirators located 83 kilograms of heroin, packaged in clear plastic bags of half-kilo weight, and removed them from a variety of hidden recesses in the door panels, under the floor board and beneath the roof. At

one point Preiss removed a bag and it tore, with heroin falling to the floor of the car and the garage.[4] After all the heroin had been removed from the car and carried into the house, the men returned to Manhattan. At dinner, with Signoli, Preiss, and the man from Marseilles, Astuto told his companions that Cirillo had arranged a celebration for them that evening. Signoli explained that it was Cirillo's custom to have such parties "after each operation."

The party held in a Manhattan apartment, was not only a social event but an occasion for making important plans for future dealings as well. Astuto, Signoli, Preiss, and the man from Marseilles, arrived at about 11 P.M. Cirillo joined them two hours later and indicated that all of the heroin unloaded from the car was acceptable, including two half-kilo bags over which there had been some concern because of the yellow color of their contents. Cirillo then turned to Preiss and instructed him that future contacts with Astuto would be made indirectly through a third person whose voice Cirillo wanted Preiss to hear on the telephone. A call was then made to Barbara Schmidt, a former girl friend of Astuto's. Astuto told Preiss in Cirillo's presence that he could always be contacted through Barbara.

The eventful day then quickly drew to a close when Cirillo insisted on paying Signoli for the drugs in private. The following day Preiss and Signoli discussed their plans for separation. Preiss informed Signoli that he had decided not to stay in America for six months but would return to Europe in the near future. Signoli assented and gave Preiss $2,000 from a suitcase filled with $100 bills and totaling about $300,000. He also handed him two telephone numbers at which Signoli could be reached in Marseilles. Preiss left the United States two or three days later and eventually returned to Paris.

## The September-October Transaction

Roger Preiss testified also to a narcotics transaction spanning the month of September and early October, 1971. Upon his return to France from New York, Preiss was again contacted by Richard Berdin, the man who originally had brought Preiss and Signoli together. Berdin informed Preiss that the ingenious Andre Labay had developed a new and expeditious means of importing heroin into the United States—this time by hiding drugs in special luggage and transporting it from France to America by air. Berdin suggested an initial shipment of 100 kilograms, to be sold to one named Soderini, Berdin's buyer in America. Preiss was assigned the role of liaison between the French suppliers —Antoine Grisoni and Andre Lajoux— and Labay. Preiss met with Grisoni and Lajoux and arrangements for the supply of heroin were made.

Berdin prepared to leave for the United States to make contact with his buyer, Soderini, but complications soon developed. Labay insisted upon payment for the narcotics on delivery, and Berdin, who had not previously dealt with Soderini, became uneasy, unsure whether Soderini would be able to meet the terms of purchase. Consequently, Berdin asked Preiss if Preiss would arrange to have his own American buyer take the responsibility for purchasing 100 kilograms of heroin. Preiss, having told Berdin that he needed Signoli's prior approval to deal with Cirillo—explaining that Signoli had threatened him with death should he deal with Cirillo without Signoli's consent—then flew to Marseilles where

---

4. The 83 kilograms of heroin were never recovered by federal authorities. However, on February 2, 1972, a United States chemist searched the Fort Lee garage pursuant to a search warrant. He vacuumed the floor into a millipore filter attached to the hose of a vacuum pump. After analysis, the chemist concluded that traces of heroin were present in areas corresponding to the places where Preiss said they had spilled and over the route he had walked when he carried the torn packet to a nearby bench. These traces of heroin were admitted in evidence against Cirillo at the trial.

he told Signoli of the 100 kilo shipment. Signoli gave his approval to the sale of drugs to Cirillo, but not without first insisting on a part of the payment for himself.

On October 6, 1971, Preiss met Lajoux and was given the key to an automobile containing 100 kilograms of heroin. Preiss brought the car to Labay who drove it to a small town outside of Paris, where he was arrested by French narcotics agents.[5]  Preiss landed in New York on October 7 and, upon his arrival at the Waldorf Astoria, he was arrested.  By that time, all the co-conspirators, with the exception of Astuto, who was never apprehended, had been placed under arrest.

## II.

### *Multiple or Single Conspiracy*

. ▆▆▆▆  Cirillo's principal argument on appeal is one not infrequently heard in complicated conspiracy cases, *see, e. g.*, United States v. Bennett, *supra*; United States v. Kelly, 349 F.2d 720 (2d Cir. 1965) cert. denied 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); United States v. Borelli, *supra*; United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959); and United States v. Russano, 257 F.2d 712 (2d Cir. 1958); *cf.* Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).  The claim is that although the indictment concededly charged only one on-going conspiracy involving two transactions, the proof at trial actually showed two independent conspiracies.[6]

Our review of the evidence adduced at trial, viewed in a manner most favorable to the Government, *see e. g.*,

United States v. Kelly, *supra*; United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied sub nom. Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963), convinces us that there was ample evidence of a single, ongoing, continuous conspiracy, and that Cirillo's claim of variance between indictment and proof is unfounded.  It can hardly seriously be contended that the facts of this case make out a so-called "spoke" conspiracy which concerned the Supreme Court in the *Kotteakos* case, where at least eight, separate and independent conspiracies had been proved. Kotteakos v. United States, *supra*, 328 U.S. at 754–755, 66 S.Ct. 1239. This case is the archetype of a "chain" conspiracy, *see e. g.*, United States v. Bruno, 105 F.2d 921 (2d Cir.) rev'd on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939); United States v. Stromberg, *supra*; United States v. Agucci, 310 F.2d 817 (2d Cir. 1962) cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); *see generally*, Note, Federal Treatment of Multiple Conspiracies, 57 Colum.L.Rev. 387, 388–393 (1957), with links connecting the conspirators at the critical nexus points of exportation, transportation and distribution of narcotics.  And here we need not concern ourselves with whether persons at the extreme end of a "chain" conspiracy adopt the attributes of participants in a "spoke" conspiracy, *see* United States v. Borelli, *supra,* 336 F.2d at 383, inasmuch as the protagonists of this drama—Cirillo, Signoli, Preiss, Astuto, Berdin and Labay—constituted the very core of an agreement, among the conspiratorial hierarchy, to illegally import heroin on a large scale for distribution in the United States.  Upon all the evidence, a rational inference could be

---

5.  101 kilograms of heroin, seized from Labay, were introduced against Cirillo at trial.

6.  Cirillo argues that the introduction against him of evidence relating to the September-October transaction—including 101 kilograms of heroin—so prejudiced his right to a fair trial that the variance between indictment and proof cannot be

considered other than material.  *Cf.* United States v. Berger, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *see generally*, Note, Developments in the Law of Criminal Conspiracy, 72 Harv.L.Rev. 920, 991–93 (1959).  The claim is a serious one in view of the imposing effect evidence of the second transaction may have had on the jury's deliberations.

drawn that the agreement was not limited to the importation of 83 kilograms of heroin in the August, 1971 transaction, but that it extended to future shipments as well. These men were engaged in the business of importing and distributing heroin whenever the chance presented itself. Of this there can be no doubt, in view of the abundant evidence in the record of proposed future dealings—not the least of which are Cirillo's representations to Preiss and Signoli that Astuto would serve as Cirillo's contact man in the future, and the elaborate communications system designed to facilitate future contacts established between Preiss, Cirillo and Astuto, after the completion of the August transaction. Although Cirillo may not have known that the September-October shipment of 101 kilograms of heroin was destined for his distribution network, its importation was well within the conspiratorial plan which he had embraced as his own just one month earlier. The district judge in his refusal to direct an acquittal made the correct judgment that a jury might reasonably have believed that the actions of Labay, Preiss and Signoli relating to the September-October shipment were within the scope of the agreement as Cirillo understood it; he expected future deliveries of heroin, and they undertook to supply it.

The appellant would have us characterize the second shipment of narcotics—the September-October transaction—as an independent venture undertaken by Berdin and Preiss, which only later brought in Signoli, and which never involved Cirillo. Cirillo advances the proposition, a novel one at best, that despite the underlying conspiratorial agreement, "all the decisions made by the participants in France cannot determine the defendant's culpability, for Cirillo was never approached with the proposition." This argument is plainly incorrect for conspiracies are most often agreements in flux, and we have held on other occasions that a defendant, once found to have been a member of the conspiracy, whatever his level of participation, may be criminally responsible for the acts of persons of whose existence he is unaware, see, e. g., United States v. Stromberg, supra, 268 F.2d at 264. Having concluded that it could rationally have been inferred that the conspiratorial agreement to which Cirillo was a party encompassed not merely a single shipment of narcotics, but extended as well to future transactions, Cirillo's unawareness that the narcotics he had solicited were in transit does not relieve him of culpability. This is so particularly in view of the fact that the buyer of heroin in the August transaction was not informed of the shipment until it arrived in America. At the very least, this would indicate that the agreement did not contemplate prior "in transit" notice. We would not require the Government to prove that the agreement in a conspiracy case necessitated a precise advance definition of each member's role, see United States v. Bennett, supra, 409 F.2d at 893. A conspiracy, once established, is presumed to continue until the contrary is shown, United States v. Stromberg, supra, 268 F.2d at 263; cf. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). And we state now, as we have stated before, that "participation in a conspiracy may continue beyond the performance of an overt act by the alleged conspirator, if the conspiracy continues in existence thereafter; affirmative proof of withdrawal is generally required," to terminate liability, United States v. Cianchetti, 315 F.2d 584, 589 (2d Cir. 1963), proof that most certainly was not forthcoming in behalf of Cirillo. The cases upon which appellant relies, e. g. United States v. Russano, supra, in which the evidence indicated that the first conspiracy had ceased between 1952 and 1955, when the second commenced, and United States v. Borelli, supra, which involved two phases of a conspiracy separated, at their point of commencement, by a period of approximately eight years, are simply inapposite to the situation involved here, in which the second ship-

ment followed the first by a period of one month, and in which the principal figures in each transaction were the same.

*Other Claims*

■■ Three subsidiary questions are left for our brief consideration. On cross-examination Preiss was compelled to admit that in prior statements to narcotics agents, and in his testimony before the grand jury, he had failed to mention his meeting with Cirillo, either at Cirillo's apartment in Miami, or at the party held in New York. In an attempt to rehabilitate the witness on redirect, the government tendered an offer of proof and a hearing was held by Judge Weinfeld outside the presence of the jury. Preiss stated, in essence, that he did not mention the meetings with Cirillo because he feared that Cirillo would kill him if he did. According to Preiss, Signoli had told him that Cirillo had contacts with the Miami office of the Bureau of Narcotics and Dangerous Drugs, and with the New York City Police Department. Signoli further stated that Cirillo would be notified in the event Preiss informed on Cirillo and that Preiss would then be killed. Preiss then was permitted to relate these facts in open court, but not before the trial judge cautioned the jury that the statements were admitted solely for the purpose of explaining away any inconsistency brought out on cross-examination. The same cautionary instructions were given, in substance, in the court's final charge. Cirillo contends that this redirect examination improperly brought his character into question, and denied him a fair trial.

The general rule, however, and one that is eminently logical, is that an "impeached witness may always endeavor to explain away the effect of [a] supposed inconsistency by relating whatever circumstances would naturally remove it." 3A Wigmore, Evidence § 1044, p. 1062 (Chadbourn rev. 1970). The rule is followed in this Circuit, *see* United States v. Berger, 433 F.2d 680, 683–684 (1970),

cert. denied, 401 U.S. 962, 91 S.Ct. 970, 28 L.Ed.2d 246 (1971); United States v. Franzese, 392 F.2d 954, 960–961 (1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), and we abide by it here.

■■ Cirillo also asserts that he was denied a fair trial by virtue of the admission of testimony of one Joseph Bux. Bux testified that in March, 1972, he met wth Cirillo and a bail bondsman in the bail bondsman's office in Manhattan. During the course of this meeting, Bux stated, Cirillo told of his plans of escaping the surveillance of narcotics agents and of preventing Preiss from testifying. According to Bux, Cirillo showed him a photograph of Preiss, told Bux that Preiss could be found at a deserted barracks in Staten Island, and requested Bux to find the barracks and determine if Preiss was actually there. Cirillo then stated he wanted to "get rid of" Preiss. Cirillo claims this testimony also brought his character into question and diverted the jury's attention from the main issues in the case.

While the testimony may very likely have worked to prejudice the appellant, it did so because the evidence was damning, not because its introduction was error. Evidence of conduct designed to impede or prevent a witness from testifying is admissible as showing consciousness of guilt, 2 Wigmore, Evidence § 278 at 124 (3d ed. 1940); *cf*. United States v. Culotta, 413 F.2d 1343, 1346 (2d Cir. 1969), cert. denied, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970). Judge Weinfeld's careful cautionary instructions as to the limited purpose for which the evidence was introduced, delivered prior to the admission of Bux's testimony and repeated in the closing charge, secured to Cirillo all the protection to which he was entitled.

■ Finally, Cirillo asserts that in conspiracy cases the jury, and not the judge, should make an assessment of whether there is sufficient, independent, non-hearsay evidence to establish a conspiracy and the defendant's participation

in it. Suffice it to say that the approach in this Circuit, as appellant concedes, is otherwise, *see e. g.,* United States v. Stromberg, *supra,* 268 F.2d at 265–266.

Cirillo's conviction is affirmed.