**UNITED STATES of America, Appellee,**

v.

**Robert MOLINA, Appellant.**

**No. 1007, Docket 78–1098.**

United States Court of Appeals, Second Circuit.

Submitted June 2, 1978.

Decided Aug. 7, 1978.

Robert J. Tronolone and Joseph Augustine, Buffalo, N. Y., for appellant.

Richard J. Arcara, U. S. Atty., and Theodore J. Burns, Asst. U. S. Atty., Buffalo, N. Y., for appellee.

Before MANSFIELD and TIMBERS, Circuit Judges, and HOFFMAN, District Judge.[*]

HOFFMAN, District Judge:

An indictment containing two counts charged Ramon Molina and Robert Molina, the appellant herein and a brother of Ramon Molina, with conspiracy to distribute heroin in the Western District of New York in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. The second count charges Ramon Molina with, on or about August 6, 1977, intentionally distributing 497 grams of heroin in violation of 21 U.S.C. § 841(a)(1), in the Western District of New York and, in the same count, charges Robert Molina with having aided and abetted in the commission of this offense in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Robert Molina was apparently accorded a separate trial. The record does not disclose the disposition of the case against Ramon Molina, other than to indicate that Robert's trial was severed from that of his brother.[1]

The appellant's participation in these alleged crimes is based in Los Angeles, and grounded upon conversations which took place at the Marriott Motor Inn near the airport of that city. The participants in those conversations were Robert Molina, Bruce Johnson, a special agent with the Drug Enforcement Administration (DEA), and one William Hebert, a Canadian who was at the time acting as an informant.

On July 31, 1977, Johnson and Hebert flew from Buffalo to Los Angeles for the purpose of meeting Ramon Molina to purchase heroin from him. Prior telephone conversations between Hebert and Ramon took place on July 13, 19, 26 and 28, 1977. Robert Molina was apparently unknown to Hebert and Johnson. Upon renting a room, Johnson contacted the Los Angeles office of the DEA to arrange for surveillance at the motel.[2] Hebert then proceeded to make three telephone calls to the residence of Ramon Molina but without success as Ramon was not available. Finally, on the fourth call, Hebert made contact with Robert Molina at Ramon's residence and Robert agreed to come to the Marriott Motor Inn. It is obvious that Ramon Molina was the object of the investigation up to this time.

When Robert arrived at approximately 7:30 p. m., Hebert introduced Robert to Agent Johnson without, of course, revealing Johnson's true interest in the matter.[3] There was some discussion of a prior shipment of 20 ounces of heroin which had been seized[4] for which there remained unpaid to Ramon Molina the sum of $15,000.00. Johnson explained that he was not supposed

[*] Of the United States District Court for the Eastern District of Virginia, sitting by designation.

1. The Government's brief states that Ramon Molina was charged in a separate two-count indictment with conspiracy to distribute heroin between July 1 and 4, 1977, and aiding and abetting Sapiclak in the possession of heroin on July 4, 1977. Ramon Molina entered a plea of guilty to the conspiracy charge on this separate indictment and the remaining counts in both indictments were dismissed pursuant to a plea agreement.

2. This is a customary practice for the purpose of protecting the agent and to verify what the participants might do or say.

3. Johnson was introduced as an associate of Hebert from the northern part of the country.

4. The Government's brief states that the seizure occurred in Buffalo and this led to the conspiracy charge referred to in footnote 1, page 57.

to get any of that heroin and, in fact, Johnson had lost money on that shipment as he had put up some of the money given to Ramon Molina in advance of the shipment.

The parties then turned their attention to the purchase of heroin at that time. Johnson expressed an interest in purchasing four ounces for $5,000.00 and indicated that prior arrangements had been made with Ramon by telephone to consummate this deal. Robert expressed his agreement but said that Ramon was in Mexico obtaining a package of heroin and was due back that night or "very soon." Apparently Robert then made a call to Ramon's residence and, upon being advised that Ramon was not present but was due back that night, advised Johnson that he should telephone Ramon the following morning and arrange for the delivery. Robert further stated that he would accompany his brother to the Marriott in order to identify Johnson for his brother's benefit. When the parties concluded their conversation the understanding was that Johnson was to call Ramon early on the morning of August 1, 1977, and Robert and Ramon would come to the Marriott for the purpose of making delivery and obtaining payment.

Johnson never made the call on August 1. The Los Angeles office of the DEA was engaged in another investigation on that date and could not provide surveillance. Hebert[5] returned to Buffalo that same night, but Johnson remained until 1:00 p. m. on August 1 without endeavoring to make further contact with either Robert or Ramon.

With the exception of the August 6, 1977 incident involving Ramon Molina, this is the totality of the evidence against appellant.

After Johnson returned to Buffalo, he contacted Ramon Molina by telephone on August 2, 1977, once again negotiating for the purchase of four ounces of heroin. Several calls were thereafter made to Ramon, or a person who identified himself as such, with a final call on August 5, resulting in Ramon's agreement to fly to Buffalo with 20 ounces of heroin on the following day to deliver to Johnson at an agreed price. Ramon arrived around 10:00 p. m. on the night of August 6 and, pursuant to the description provided by Ramon in his telephone conversations, Johnson and Special Agent Kenneth B. Peterson met him in the airport waiting area. The three men left the airport, went to a parking lot, and entered an automobile. Ramon was wearing a waist band from which he produced approximately 20 ounces of heroin. Ramon handed the packages to Peterson seated in the back seat. Johnson had about $21,000.00 on his person to effect the purchase. However, after the packages were handed to Peterson, the agents arrested Ramon and this prosecution followed.[6]

The record is silent as to any reference to Robert Molina in the telephone conversations between Johnson and Ramon during the first few days of August. Nor was Robert mentioned nor present when the events of August 6 took place. It may, however, be a fair inference to conclude that Johnson at least mentioned to Ramon the fact that he had met with Robert on the night of July 31.

I

Faced with these facts the sole inquiry is whether there was sufficient evidence to go to the jury on either count of the indictment. There were no exceptions to the charge as delivered by the district judge. Concurrent sentences under the Federal Youth Correction Act, 18 U.S.C. § 5010(c), to a maximum term of eight years and a special parole term of four years were imposed.

---

5. Hebert did not testify at the trial. He is wanted by the United States on one or more narcotic charges. In fact, all of the evidence contained in the Appendix was from Agent Johnson and a fellow agent, Peterson, who witnessed the August 6 aborted sale from Ramon to Johnson. The Government's brief states the evidence consisted of five DEA agents and a chemist. Other than Johnson and Peterson, we assume that the balance of the testimony did not refer to Robert Molina.

6. There is an obviously incorrect reference to "Robert" Molina by agent Peterson (App. 62, 1. 5).

## II

■ With respect to the conspiracy count there certainly appears to have been a general agreement between Ramon and Robert to sell heroin to Johnson. In fact, if the heroin had been available on the night of July 31, Robert was willing to consummate the deal involving four ounces. Moreover, the evidence justifies the conclusion that Robert was either a partner with or agent for his brother, Ramon. Robert voluntarily injected himself into the conspiracy after conferring with Hebert who had prior dealings with Ramon. It is true that Robert may have been a minor participant in contrast to Ramon but, in the eyes of the law, he was in fact a coconspirator. A defendant, once found to be a member of a conspiracy, may be held criminally liable for acts of other conspirators if such acts are done as a part of a general scheme or plan. *United States v. Cirillo*, 468 F.2d 1233, 1239 (2d Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); *United States v. Arroyo*, 494 F.2d 1316, 1319 (2d Cir. 1974), *cert. denied*, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974).

Of particular significance is the *Cirillo* case. As Judge (now Chief Judge) Kaufman said: "The critical inquiry in any conspiracy case involves a determination of the 'kind of agreement or understanding [that] existed as to each defendant . . . as he understood it.'" *Cirillo* involved two transactions, one in August, 1971, another in September-October, 1971. The defendant was not present at the time of the September-October transaction, but there was ample evidence to establish that he was a member of the conspiracy in the August deal. A conspiracy once established is presumed to continue until the contrary is shown. *United States v. Stromberg*, 268 F.2d 256, 263 (2d Cir.) *cert. denied*, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). The court in *Cirillo* held that a jury might reasonably have believed that the actions of the coconspirators relating to the September-October shipment were within the scope of the agreement as Cirillo understood it, i. e., he expected future deliveries of heroin and they understood to supply it, even though Cirillo may not have known that the second shipment was destined for him.

■ In the instant case it is manifestly clear that Robert was interested in promoting a sale to Johnson. In fact, he expected a sale to take place the following morning. The evidence was sufficient to establish that Robert and Ramon were conspiring together to commit offenses against the laws of the United States. "Participation in a conspiracy may continue beyond the performance of an overt act by the alleged conspirator, if the conspiracy continues in existence thereafter; affirmative proof of withdrawal is generally required to terminate liability." *United States v. Cirillo, supra; United States v. Cianchetti*, 315 F.2d 584, 589 (2d Cir. 1963). Assuredly, there was no scintilla of evidence indicating that Robert had withdrawn his interest in his brother's activities. Nor are we impressed by the fact that the last act of the conspiracy occurred six days after Robert Molina had last actively participated in the partnership endeavor. In *Cirillo* the second shipment followed the first by a period of one month and the principal figures were the same.

We hold that under the adequate charge by the district court the jury could reasonably find that the conspiracy continued through the events of August 6, and the acts of Ramon on that night were, for conspiracy purposes, the acts of Robert.

## III

Dealing with the substantive count of aiding and abetting with respect to the distribution of heroin at the Buffalo airport on the night of August 6, we are confronted by a somewhat different principle of law.

As Judge Mansfield said, in dissenting in part as to the aiding and abetting charges in *United States v. Blitz*, 533 F.2d 1329, 1346 (2d Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976), it places "undue strain on the concept to reason that, once a general conspiracy is shown, a minor or subordinate member who commits some act in furtherance of it thereby becomes an

aider and abettor of parallel conduct of which he was unaware on the part of another member whose existence is unknown to him, merely because he should have reasonably foreseen that his conduct might assist others to commit such acts." However, Judge Mansfield indicated that if a charge had been given pursuant to *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), he might not have dissented, *United States v. Blitz, supra,* at 1347.

■ We believe that the district judge substantially included the essential elements in *Pinkerton* and charged the jury correctly.[7] The *Pinkerton* rule, while the subject of some criticism, is still the law. The facts in *Pinkerton* are essentially the same as those here presented. Each case involved brothers. As Mr. Justice Douglas said in *Pinkerton* :

> There is, however, no evidence to show that Daniel participated directly in the commission of the substantive offenses on which his conviction has been sustained, although there was evidence to show that these substantive offenses were in fact committed by Walter in furtherance of the unlawful agreement or conspiracy existing between the brothers. The question was submitted to the jury on the theory that each petitioner could be found guilty of the substantive offenses, if it was found at the time those offenses were committed petitioners were parties to an unlawful conspiracy and the substantive offenses charged were in fact committed in furtherance of it.

The facts in *Pinkerton* are more persuasive toward an acquittal on the substantive counts than here presented. The brother, Daniel, was actually in the penitentiary when some of the substantive offenses were committed by Walter. Nevertheless, the Supreme Court upheld the convictions on the substantive counts as to Daniel.

*Pinkerton* was followed by *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949), a case involving substantive charges of "aiding and abetting," along with a general conspiracy. In *Nye & Nissen* the *Pinkerton* charge was not given. Mr. Justice Douglas, again writing for the majority, recited these facts:

> There is no direct evidence tying Moncharsh to the six false invoices involved in the substantive counts. Yet there is circumstantial evidence wholly adequate to support the finding of the jury that Moncharsh aided and abetted in the commission of these offenses. Thus there is evidence that he was the promoter of a long and persistent scheme to defraud, that the making of false invoices was a part of that project, that the makers of the false invoices were Moncharsh's subordinates, that his family was the chief owner of the business, that he was the manager of it, that his chief subordinates were his brothers-in-law, that he had charge of the office where the invoices were made out.

*Nye & Nissen* stands for the principle that, even though there be a conspiracy, the independent proof may justify a charge on aiding and abetting. As Mr. Justice Douglas said:

> In *Pinkerton v. United States, supra,* a conspiracy and substantive offenses were charged. We held that a conspirator could be held guilty of the substantive offense even though he did no more than

---

7. The charge, in part, provided:

So once you have found that a conspiracy existed between Ramon and Robert you then can take anything done by Ramon such as delivering the drugs in Buffalo or having telephone conversations about it or anything like that and charge that against Robert criminally as long as you are satisfied that the conspiracy was still in existence and they both were still members and what was done or said was done pursuant to or trying to affect the purpose of the conspiracy. Now, other-

wise I said any act which is done or any admission or any statement which was made outside of Court by one person cannot be considered as evidence against another person. So any act or statement that Ramon might have made or done which even though it was at a time when the conspiracy was in existence and the two of them were members, if Ramon did something that had no relationship to the purpose of the conspiracy that would not be chargable [sic] against Robert, that is the affect [sic] of that.

join the conspiracy, provided that the substantive offense was committed in furtherance of the conspiracy and as a part of it.

There are, of course, cases which fall within the exceptions in *Pinkerton* where (1) the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, (2) did not fall within the scope of the unlawful project, or (3) was merely a part of the ramifications of the plan which could not reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement. This is the principal issue in the present case and we hold that, as a matter of law, the exceptions in *Pinkerton* are not applicable although from the evidence the jury could have found for the defendant.

In *United States v. Greer*, 467 F.2d 1064 (7th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), Greer was indicted for a conspiracy having three objectives: (1) to steal from an interstate shipment; (2) to transport the cargo in interstate commerce; and (3) concealing stolen cargo. He was also charged with a substantive count of transporting the cargo of copper from Greenfield, Indiana, to Chicago, Illinois, as an aider and abettor. The Seventh Circuit, without reference to *Pinkerton*, upheld the conspiracy conviction on the ground that the information supplied by Greer carried an inference of an objective to steal from a proven interstate shipment, but reversed the conviction on the substantive count because there was no proof that Greer intended to aid in post-theft plans, or that he knew details of the thieves' travel plans, such as the specific destination of the goods. Greer's participation was limited to providing the thieves with information about the copper, where it was located and, after the theft, telephoning one of the co-conspirators in order to claim a part of the proceeds; an appointment he did not keep and, according to the record, Greer did not participate in the loot. The court stated that Greer's participation was equivalent to that of an "accessory before the fact" and to prove Greer's complicity with the later stages of the crime—namely, the transportation of the copper from Indiana to Chicago—the Government must prove that either (1) Greer intended to aid in post-theft plans, *or* (2) he knew the details of the thieves' travel plans.[8]

The distinction between *Greer* and the present case is apparent. Robert Molina not only expressed an interest in the distribution and sale of heroin following the meeting of July 31, but also agreed to appear with his brother on the following morning to identify Johnson as the trustworthy purchaser. He established his interest in a prior transaction which was aborted by the seizure and was thoroughly familiar with the financial details. The jury could have reasonably found that the sale in Buffalo was the foreseeable result of Robert's conversations with Johnson and his informant. The location of the sale on August 6 and the quantity involved are immaterial. We hold that *Pinkerton* applies and the judgment of conviction on both counts is affirmed.

Affirmed.

---

8. 18 U.S.C. § 2 abolished the differentials in punishment between an accessory before the fact and a principal. Under common law an aider and abettor had to be present at the site of the crime. An accessory before the fact is one who, though absent, procures, counsels or commands another to commit an unlawful act. 18 U.S.C. § 2(a) combines these two classifications, making each such defendant equally as guilty as the principal. Courts now indiscriminately refer to both as aiders and abettors. *Morei v. United States*, 127 F.2d 827, 830 (6th Cir. 1942).