UNITED STATES of America, Appellee,

v.

Eric BLITZ et al., Appellants.

Nos. 259, 262, 281 and 421, Dockets 75–1237, 75–1240, 75–1241 and 75–1334.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1975.

Decided March 25, 1976.

Elliot L. Evans, New York City (Paul K. Rooney, and Rooney & Evans, New York City, on the brief), for appellant Blitz.

Jerome T. Dorfman, New York City (Bernard J. Coven, New York City, on the brief), for appellant Horvat.

William L. Richman, New York City, for appellant Orpheus.

H. Elliot Wales, New York City, for appellant Drew.

Dominic F. Amorosa, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., Michael B. Mukasey, Mark Marmaro, John D. Gordan, III, Asst. U. S. Attys., New York City, and Edward Levitt, Sp. Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before LUMBARD, MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants Eric Blitz, Peter Horvat, Richard Orpheus and William Drew[1] appeal from judgments of conviction entered upon jury verdicts returned in the Southern District of New York on March 3, 1975 after a five week trial before Dudley B. Bonsal, *District Judge*, finding Horvat, Orpheus and Drew guilty of conspiring to violate the antifraud provisions of the federal securities laws and the mail fraud statute in violation of 18 U.S.C. § 371 (1970) (Count 1);[2] finding

---

1. The indictment named eleven defendants in addition to the four appellants. Prior to trial, defendants George C. Van Aken, Stephen R. Hill, John J. Santiago, Erwin Gerstenzang, Peter B. Rosenthal, William McLeod and Barry M. Ross pleaded guilty to the conspiracy count (Count 1), and Robin G. Baron pleaded guilty to securities fraud (Count 2). The cases against defendants Robert Turco and Frank Kadison were severed prior to trial. Defendant Robert J. Rosan, who was tried with appellants, was acquitted on all counts.

The perjury count (Count 21) against appellant Horvat was severed prior to trial.

2. As submitted to the jury, the conspiracy count (Count 1) charged a conspiracy to violate Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1975), as well as a conspiracy to violate the mail fraud statute, 18 U.S.C. § 1341 (1970). The same antifraud provisions of the securities laws and the same provision of the mail fraud statute constituted the bases of the substantive counts (Counts 7–13 and 14–18, respectively).

Horvat, Orpheus and Drew guilty on substantive counts of fraud in connection with the purchase and sale of securities in violation of Sections 10(b) and 32 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78(ff) (1970), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5 (1975), and of aiding and abetting such fraud in violation of 18 U.S.C. § 2 (1970) (Counts 7–13); finding Horvat and Orpheus guilty on substantive counts of mail fraud in violation of 18 U.S.C. § 1341 (1970) and of aiding and abetting such fraud in violation of 18 U.S.C. § 2 (1970) (Counts 14–18); [3] and finding Blitz, an affiliated person of a registered investment company and acting as an agent, guilty of accepting outside compensation for the purchase of property in violation of Sections 17(e) and 49 of the Investment Companies Act of 1940, 15 U.S.C. §§ 80a–17(e)(1) and 80a–48 (1970) (Count 19).[4]

The essential claims of error raised on appeal are: (1) the evidence was insufficient to support the convictions of Horvat, Orpheus and Drew of either conspiracy or the substantive offenses; (2) Blitz and Horvat were entitled to severances; (3) the indictment was defective with respect to Blitz and Horvat because allegedly incompetent evidence was presented to the grand jury; and (4) the court erred in charging the jury and in its evidentiary rulings.

The twenty‑five count indictment charged a conspiracy and substantive offenses to manipulate the price of the common stock of Elinvest, Inc. in order to obtain for defendants large profits on their holdings while defrauding public investors. Count 1 charged a conspiracy to violate the antifraud provisions of the federal securities laws and the mail fraud statute; as overt acts it alleged that the co-conspirators themselves made fraudulent sales of Elinvest stock, paid off brokers to sell the stock to their customers and to stimulate demand for it, and bribed an investment adviser to purchase a large amount of the stock on behalf of an investment company. Counts 2–13 and 14–18 charged substantive violations of the antifraud provisions of the securities laws and of the mail fraud statute, respectively, based on fraudulent sales and mailings by defendants, or aided and abetted by them. Count 19 charged that an affiliated person of a registered investment company accepted a $25,000 bribe to cause the company to purchase 25,000 shares of Elinvest stock. Count 20 charged certain defendants with interstate travel in furtherance of the illegal scheme. Counts 21–25 charged two defendants with perjury before the grand jury.

The government concedes that the evidence was insufficient to convict Orpheus and Drew on six of the seven substantive securities fraud counts (Counts 7–12), and that it was insufficient to convict Orpheus on four of the five mail fraud counts (Counts 14–17). We therefore reverse the convictions of Orpheus and Drew on those counts.

For the reasons below, we affirm the convictions of all appellants on all other counts upon which they were convicted.[5]

---

3. The substantive securities fraud counts (Counts 7–13) and the substantive mail fraud counts (Counts 14–18) charged either that the named defendants themselves had committed the crimes specified or that they were responsible for fraudulent sales by others in violation of the aiding and abetting statute. See pages 1341–1343, *infra.*

4. At the close of all of the evidence, the conspiracy count (Count 1) was dismissed as against Blitz; and the substantive counts (Counts 2–6) which charged violations of Sections 17(b) and 24 of the Securities Act of 1933, 15 U.S.C. §§ 17q(a) and 77x (1970), were dismissed as against all appellants.

Drew was acquitted on the mail fraud counts (Counts 14–18). Blitz was acquitted on the securities fraud and mail fraud counts (Counts 7–18).

Otherwise, the four appellants were convicted on all counts which were submitted to the jury.

5. Appellants were sentenced as follows:

| Count 1: | | |
|---|---|---|
| | Drew .... | Six months imprisonment, followed by two years probation. |
| | Horvat ... | Six months imprisonment, followed by two years probation. |
| | Orpheus .. | Three months imprisonment, followed by two years probation. |

## I. FACTS

In view of the issues raised on appeal, including challenges to the sufficiency of the evidence, the following summary of events from March of 1971 until August of 1972 is believed necessary to an understanding of our rulings on those issues.

### (A) Overall Conspiracy

There was evidence adduced by the government from which the jury could find that the core of this case was a large scale conspiracy. It was engineered chiefly by George Van Aken. Its purpose was to drive up the price of the common stock of Elinvest. After gaining control of the limited public market in Elinvest, Van Aken and his co-conspirators manipulated the supply and demand of the stock, paid off brokers to foist Elinvest shares upon their customers, and utilized deceit and threats of force to induce the public to invest in the stock. The object was to net Van Aken and his co-conspirators an enormous windfall on their stock interests in Elinvest at the expense of innocent public investors.

### (B) Take-over of Elinvest Market

In March 1971, Van Aken[6] discovered that Elinvest common stock would make a good vehicle for stock manipulation. Elinvest was a shell corporation with virtually no assets. At that time its common stock, which was held by a small number of persons who had acquired it as a stock dividend, was selling for about $4 per share. Since there were only about 40,000 public shares which could be freely traded and they were in the hands of a relatively small number of shareholders, the price could easily be driven up.

Control of the small public market in Elinvest was accomplished by having several of Van Aken's business acquaintances, who had controlled Elinvest, cause that company to purchase the assets of the Leisure Time Marine Corp. (LTMC) in exchange for a distribution of Elinvest stock to LTMC shareholders.[7] Although Van Aken owned no LTMC stock himself, he was a large creditor of that corporation. He arranged for his father-in-law, John Bradley, to purchase 50,000 shares from LTMC for $50,000[8] upon the understanding

---

Counts 7–13: Drew . . . . One year suspended sentence.
Horvat . . . Imposition of sentence suspended.
Orpheus . . Imposition of sentence suspended.
Counts 14–18: Horvat . . . Imposition of sentence suspended.
Orpheus . . Imposition of sentence suspended.
Count 19: Blitz . . . . One year imprisonment and $5,000 fine.

**6.** Before trial, Van Aken pleaded guilty to the conspiracy count (Count 1). He became a key government witness against appellants and Rosan. He was sentenced to a three year term of imprisonment and a $10,000 fine on this count.

At the same time Van Aken was sentenced to a concurrent three year term of imprisonment and an additional $10,000 fine on his guilty plea to one count of another indictment for conspiring to violate the securities laws with respect to the stock of Health Evaluations Systems, Inc. In the Health Evaluations indictment Van Aken also was charged with masterminding a large scale market manipulation similar to the Elinvest manipulation.

In addition to the Elinvest and Health Evaluations indictments, Van Aken was indicted in November 1972 for various securities law violations in connection with the stock of Academic Development Corp., including fraud and bribery of an investment adviser. After Van Aken's guilty pleas to the other two indictments, the Academic Development indictment charges against him were dismissed.

Aside from Van Aken, defendants Gerstenzang, Rosenthal, McLeod and Ross, each of whom had pleaded guilty to the conspiracy count prior to trial, see note 1 *supra,* testified for the government at trial. The government also called as witnesses a number of customers who testified that they had been fraudulently induced to purchase Elinvest stock.

**7.** LTMC was a small and financially unsound corporation. Since LTMC stock was restricted and not freely tradable, it could not be used for market manipulation.

**8.** Bradley actually paid $45,000. The remaining $5,000 of the purchase price was paid by cancelling $5,000 of LTMC's debt to Van Aken's wife.

that Bradley would get the first $50,000 of any profit and Van Aken would get any profit beyond that. In addition, after the plan to acquire control of Elinvest had coalesced, Van Aken loaned one Steven B. Duke $7,500 with which to purchase 55,000 shares of LTMC stock.

The take-over of the Elinvest market was engineered by Van Aken and Steven Hill, a New York securities attorney and corporate counsel to LTMC. On April 26, 1971, the acquisition by Elinvest of LTMC's assets was consummated. Under the terms of the agreement, each LTMC shareholder received 1.4 shares of Elinvest for each LTMC share he had formerly held. Although there were approximately 48 LTMC shareholders at the time of the exchange, Hill and Van Aken arranged for all of the newly issued Elinvest shares which were distributed to LTMC shareholders to bear restrictive legends, except those issued to Bradley, Duke, Hill and Hill's two law partners.[9]

In May 1971, Bradley received 70,000 freely tradable Elinvest shares in exchange for his LTMC stock and Duke received 77,000 unrestricted shares. All of the other outstanding Elinvest shares were restricted as to tradability, except those issued to Hill and his partners and the 40,000 shares publicly held by original Elinvest shareholders.

This left Van Aken and his co-conspirators in effective control of the public market in Elinvest. The stage was set for manipulation of the price of the stock.

(C) *Blitz and the Astron Fund*

In May or early June 1971, Van Aken telephoned Blitz, vice-president and portfolio manager of the Astron Fund.[10] He offered Blitz $25,000 if he would cause the Fund to purchase 25,000 shares of Elinvest from Bradley at $5 per share.[11] Blitz was noncommittal at the time. In a telephone conversation with Van Aken several days later, however, Blitz said he was interested in buying the 25,000 shares for the Fund and asked if the $25,000 offer was still open. Blitz said his brother was having legal difficulties and that he needed the money for legal fees. Van Aken told Blitz he would be paid the $25,000 after the Astron Fund's purchase of the Elinvest stock was completed.

On June 9, 1971, Blitz caused the Astron Fund to purchase 25,000 shares of Elinvest for $125,000 from Bradley through R. J. Rosan & Co. This was the New York brokerage firm of defendant Rosan where Van Aken had said the stock would be available.[12] Several days later, Blitz came to New York. He telephoned Van Aken

---

**9.** After being informed that Van Aken intended to drive up the price of Elinvest stock, Hill requested that his legal fees be paid in LTMC stock which eventually would be converted into freely tradable Elinvest stock.

**10.** The Astron Fund was a West Coast mutual fund. Blitz worked out of Tacoma, Washington.

**11.** As portfolio manager of the Fund, Blitz had complete control over the Fund's investments.

**12.** Van Aken testified that, after Blitz had agreed to purchase the initial 25,000 shares, he called Blitz and asked if he would have the Fund purchase an additional 2,000 shares of Elinvest. Blitz agreed to have the Fund make the additional purchase, but it is not clear whether this purchase was ever consummated.

Van Aken also testified that he told Blitz he wanted the Fund to purchase the additional 2,000 shares "to lighten the position that one of the market makers had." Van Aken's market

manipulation was effected largely through "market makers." A market maker or trader purchases and sells securities as a principal for his own account or the account of his firm. His profit is the difference between what he "bids" and "asks". By trading the securities, he in effect "makes a market" in the securities. Market making, as such, is legal and is a common practice.

Van Aken and his co-conspirators obviously were concerned with the possibility that the market makers, who had become nervous about the size of their holdings, might start selling their shares at prices which would undermine Van Aken's efforts to drive up the price of Elinvest.

Van Aken's testimony that he asked Blitz to purchase the additional 2,000 shares to lighten the holdings of one of the market makers indicates that Van Aken informed Blitz of the method by which he was attempting to control the market for Elinvest.

and said that he wanted to pick up the $25,000. Van Aken told Blitz he would have Bradley write a check. Thereafter Blitz and Van Aken met at a New York restaurant. Van Aken handed Blitz a $25,-000 check drawn by Bradley to Blitz. Significantly this check was post-dated to June 18, 1971—the date payment was due for the 25,000 shares purchased by the Astron Fund.

In March 1972, when it had become apparent that the SEC was investigating the Elinvest trading, Van Aken telephoned Blitz and told him that he should return the $25,000 bribe to Bradley to protect them both. Blitz said he did not have the money at the time. He refused to accept Van Aken's subsequent telephone calls. Van Aken then asked Peter Rosenthal, a broker with Greenman & Co., to get the money back from Blitz. Rosenthal told Blitz that if he returned the money to Bradley he could claim that it was merely a loan.[13] In August 1972, Blitz sent Bradley a check for $26,700 accompanied by a letter which stated that the check was in repayment of a $25,000 loan plus interest.[14]

(D) *"Apartment Group"*

Backing up for a moment, in June 1971 Van Aken arranged for Bradley to pay Rosenthal a $50,000 commission for selling 25,-000 shares of Bradley's Elinvest stock for $100,000 to two of Rosenthal's customers.[15] This stock was sold through R. J. Rosan & Co.

Toward the end of the same month, Sonny Santini introduced Orpheus to Van Aken. Orpheus told Van Aken that he was a broker for Ridgeway, McLeod & Associates (RMA), although he was never em-

ployed by that firm. He said that he had some customers with "buying power" and was interested in selling Elinvest stock for Van Aken. Van Aken arranged a meeting at his home with Orpheus, Santini and Duke to discuss plans for selling some of Duke's shares. At this meeting Duke gave Orpheus 10,000 of his Elinvest shares to sell.

On June 28, 1971, Van Aken permitted Santini, Orpheus and one Julie Gladstein to move into Van Aken's apartment to sell Duke's Elinvest shares since they were unable to find office space elsewhere. At that time Van Aken informed Orpheus that his plan was to raise the price of Elinvest to $7 or $8 per share on the open market and then to bring in some institutions to buy up the stock.[16]

Santini and Orpheus approached William McLeod, President of RMA, and offered him commissions and profits on the sales of Elinvest to their customers if McLeod would allow them to effect the sales through RMA and if RMA would handle the paper work. McLeod testified that Orpheus and Santini told him that when the stock reached $7 or $8 a fund would buy back the stock through RMA.

The so-called "apartment group" got into full boiler room operation on June 29, 1971 when Santini, Orpheus, Gladstein, Bradley, Erwin Gerstenzang, Don Viggiano and Van Aken met at the latter's apartment. Van Aken told the group that he wanted to get the price of the stock above $6 because a mutual fund would purchase a large block on the market when it reached that level. Santini confirmed Van Aken's statement and promised the others 50¢ to 75¢ for each share they sold.

---

13. Rosenthal testified that, when he told Blitz that Van Aken wanted the money returned because of the SEC investigation, Blitz asked him whether Van Aken was bluffing and said he thought the demand was merely a scare tactic by Van Aken. Blitz also told Rosenthal that Van Aken's demand for return of the money was unfair.

14. Van Aken testified that neither he nor Bradley gave Blitz a promissory note when Blitz returned the money to Bradley.

15. On Van Aken's instructions, the money was paid by Bradley to Duke who delivered it to Rosenthal.

16. Van Aken testified that actually he never intended to have a fund buy the stock, but that he intended to sell Bradley's shares in the market himself after he and his co-conspirators had elevated the price of the stock. Eventually Van Aken began "backdooring" this stock before his co-conspirators realized that he was secretly diluting the market.

On that same day the co-conspirators began calling customers and market makers on the two phones in Van Aken's apartment. Santini managed the sales operation. Gerstenzang, Gladstein, Viggiano and Orpheus called prospective buyers to solicit purchases of Elinvest stock in Duke's name. Most of the persons called were customers of the various co-conspirators or customers of RMA. Typically, the salesmen told the prospect that the stock was selling for $3 or $4; that a mutual fund was planning to buy up the stock when it reached $6; and that the prospect could make a profit if he held the stock until he was told to sell it. The co-conspirators gave no indication that they were not employed by RMA. They did not inform prospective purchasers that they were being paid by a private seller for each share they sold, or that they were calling from an apartment rather than from a licensed brokerage firm.[17]

In addition to calling private customers, Orpheus telephoned various market makers to solicit purchases. When these brokers became nervous about having purchased more Elinvest stock than they could sell on the market, Orpheus would buy back the stock in the name of RMA and then inform McLeod of RMA's purchase.

Orpheus also was responsible for keeping track of sales made from the apartment. The salesmen informed Orpheus of each sale made. Orpheus telephoned details of the sale to McLeod who then called the customer and confirmed by mail the customer's purchase. When a customer paid RMA for purchases of stock in Duke's name, McLeod drew a check payable to Orpheus and Orpheus paid Duke.

This selling operation continued for several days, from 10 A.M. to 4 P.M. daily. Then Van Aken asked Santini to move the operation out of his apartment. Santini referred Van Aken to Drew who told Van Aken that they needed the apartment and

that "if you get wise you can be pushing up daisies". The group continued to use the apartment several days a week through September 1971.

Gerstenzang testified that Drew was at Van Aken's apartment three or four times during July 1971. At one point Drew heard Gerstenzang complain about what he was being paid. Drew threatened to "work over" Gerstenzang unless he continued making calls to customers. Gerstenzang, miffed, did not come to the apartment for about a week. This invited a call from Drew who said to Gerstenzang that he was "involved with us", "a part of the group", and threatened to teach Gerstenzang a lesson unless he returned to work.

Several victims of the group's salesmanship testified at trial as to how they had been solicited. For example, Dean Willeford, a general partner in a California firm, testified that on June 29, 1971, Viggiano approached him in California with a mutual friend and introduced himself as a salesman for RMA. Viggiano told Willeford that he could "guaranty" the partnership a quick profit of 10% if it invested in Elinvest because a fund intended to buy up the Elinvest stock when it reached $7. Viggiano explained that the fund could not purchase the stock before it reached $7 because its charter prohibited the purchase of stock which sold for less. Several days later, Orpheus, Van Aken and Santini[18] telephoned Willeford and gave him the same pitch. Orpheus introduced himself as a RMA broker and indicated that the investment had RMA's endorsement.[19] Santini also gave Blitz' name to Willeford as a reference. Willeford then purchased through RMA 1,000 shares of Elinvest at $5 per share for his personal account.

On July 19, 1971, more than a week after Willeford's first purchase, Orpheus called him again to persuade him to make a fur-

---

**17.** Duke was present in the apartment on several occasions when the stock was being sold.

**18.** The three spoke together with Willeford on the telephone. Willeford testified that Santini and Orpheus did most of the talking.

**19.** Van Aken introduced himself as the president of Elinvest.

ther purchase. Orpheus told Willeford that the stock was "ready to move", that it would reach $6 or $7 within the next few days, and that the fund was preparing to make its block purchase. Orpheus also said that the fund already had purchased 30,000 shares, that it was so happy with its purchase that it intended to buy 30,000 more shares at $7, and that it had given "a tentative order" to buy still another 30,000 shares as high as $11 per share. On this representation Willeford on behalf of his partnership immediately purchased from Orpheus another 1,000 shares at $5¼. To Willeford's dismay, Elinvest had plummeted to 50¢ per share by the time he sold his stock on December 31, 1971.[20]

Another victim of the group's solicitation who testified was Norman Pollisky, a registered representative with the New York brokerage firm of Rimson and Co. and a long time friend of Gladstein. Pollisky met with Gladstein, Santini and Drew at a New York bar in June 1971. At this meeting the three asked Pollisky to purchase 1,000 to 2,000 shares of Elinvest when the price reached $5½ to $6. They promised Pollisky $50 for each hundred shares he purchased. Pollisky said he wanted to see some financial reports on Elinvest before he would make any purchase.[21] He was told that he would be provided with such reports.

About a week later Drew telephoned Pollisky and told him that he wanted him to buy 500 shares of Elinvest that day. Pollisky said he had not received any financial reports on Elinvest. Drew renewed his de-

mand that Pollisky make a purchase immediately. Pollisky refused.

The next day Drew called again. He asked whether Pollisky had purchased the 500 shares. Pollisky said he had not. Drew told him that if he did not buy 500 shares of Elinvest he would come up to Pollisky's office and punch him in the mouth. Pollisky asked to speak with Santini. Drew responded, "You are talking to me now. I represent him too." Shortly thereafter Santini apologized for Drew's conduct and told Pollisky that he had calmed down Drew. The next day Pollisky purchased 200 shares of Elinvest for two of his customers at $4½ per share.[22]

During the summer of 1971, 3,000 shares of Duke's Elinvest stock were sold to the public from the apartment for approximately $15,000. In addition, Orpheus, who monitored the market's supply and demand in order to maintain price stability, purchased on behalf of RMA 10,000 shares of Elinvest from various brokers for subsequent sale.

### (E) Baron & Co. Sales

In addition to the sales made from the apartment, by the Rosan firm and by the individual co-conspirators, a large volume of sales was made through Baron & Co., a New Jersey brokerage firm whose principal partner was Robin G. Baron. Van Aken met Baron and George Linder at Steven Hill's office in May 1971. Van Aken then introduced Linder to Duke. Linder agreed with Duke that he, Linder, would try to find a broker to sell 50,000 shares of Duke's

---

**20.** As the price of Elinvest began to drop, Orpheus and McLeod persuaded Willeford to retain his stock. They explained that the "temporary" slip was due to Santini's having dumped a large amount of Elinvest on the market. Orpheus at first convinced Willeford that the temporary dilution of the market would be corrected. As the stock continued to decline, however, Willeford began calling Orpheus and McLeod with greater frequency. Late in August, Orpheus told Willeford to bail out of Elinvest at $2½. He promised Willeford that he would give him 1,000 shares in another bright prospect. Orpheus also agreed to sell Willeford's Elinvest stock for him. Orpheus later told Willeford that unfortunately he could not

find a buyer. Willeford never was given the other 1,000 shares.

**21.** Without any financial data whatever, Gladstein, Santini and Drew had tried to convince Pollisky to purchase Elinvest by showing him a picture of the marina which Elinvest had acquired from LTMC.

**22.** Pollisky testified that he had suspected that Gladstein, Santini and Drew were manipulating the price of Elinvest. He said that he had turned down their offer initially because he had hoped to profit from the information they had given him by getting his customers to purchase Elinvest stock without becoming personally involved with Gladstein's group.

Elinvest stock for a fee of 25% of Duke's profits. Upon Linder's invitation, Baron agreed to sell the stock through Baron & Co. to the firm's customers. Baron promised Van Aken that he would have his customers hold the stock for six months so that Elinvest would remain in short supply on the market and the price would remain stable. In return, Van Aken promised Baron that he intended to "stay in for the long haul".

Between May and August of 1971, Baron & Co. sold its customers about 35,000 shares of Elinvest at $4 per share. The firm purchased the stock from Duke at $3.[23] The firm did not pay for the stock until it had arranged a sale.

A large percentage of the Elinvest shares sold by Baron & Co. were sold through appellant Peter Horvat, one of the firm's brokers. During a substantial part of the period from June through August 1971, Horvat earned almost all of his commissions from sales of Elinvest.[24] His commission was 50¢ for each share he sold although the stock sold for only $4. Horvat knew that Baron & Co. was making $1 per share, or 25% of the sales price.[25]

Four witnesses testified that Horvat had induced them to purchase Elinvest stock with extravagant predictions of rapid prof-

its. Michael Separ purchased $800 worth of Elinvest at $4 after Horvat and Baron told him that they had inside information about Elinvest and that the stock would soar to $10 or $12 in a short time.[26] Horvat induced other long time friends and customers, including witnesses Thomas Nash, Frank Capsouras and Archibald W. Denny, Jr., to buy upon similar representations of quick profits.[27] Neither Horvat nor Baron disclosed to any of these purchasers the nature or source of their inside information.

Several days after he had purchased his 200 shares Separ called Horvat and said that he wanted to sell his newly purchased Elinvest stock.[28] Horvat told Separ not to sell because that would depress the market for the stock. According to Separ's testimony:

"He told me that I couldn't—I shouldn't sell it, because I am going to depress the market in it, and they are trying to make a market in it, and, you know, like I say, I'm not in the business; I don't know the familiar terms. These are my words."

Baron then came on the phone and told Separ not to sell the stock. When Separ asked for his stock certificates Baron told him that delivery would take some time because paper work had to be completed.

---

**23.** Duke received almost $105,000 for shares sold by Baron & Co. between May 14 and August 16, 1971. With a mark-up of $1 per share, Baron & Co. made approximately $35,000 in profits.

**24.** During one nine week period, Horvat's commissions from Elinvest sales totalled $3,637.50, while his commissions from all other sales amounted to only $63.75.

**25.** Horvat usually received one-half of the firm's total commission on shares he sold. The firm's total commission legally could not exceed 12.5% for shares sold by the firm as an agent or broker. On shares bought and sold for its own account as a dealer, however, the firm legally could take a larger profit. A 25% profit on sales of securities at no risk was most unusual.

**26.** Separ purchased 200 shares at $4 per share. Horvat told Separ that the stock was worth $5 or $6 per share and that Baron & Co. was selling him the stock at a discount.

Like most of those who were duped by the scheme, Separ was an unsophisticated and inexperienced investor. He testified that he did not understand many of the terms which Horvat used when he pushed the Elinvest stock.

**27.** Nash, a close friend of Horvat for ten years, purchased at least 100 shares at $4, after Horvat told him the stock would "take off" and reach $6 or $8 in a couple of weeks.

Horvat told his friend Capsouras that the price of Elinvest would double in three months. Capsouras purchased 300 shares at $4.

Denny, after being told by Horvat that Elinvest would reach $6 or $8, purchased 200 shares at $4.

**28.** Separ's interest in selling Elinvest so suddenly was due to Horvat's earlier representation that the stock purchased by Separ at $4 really was worth $5 or $6 on the market at the time it was purchased and that Separ was being given some sort of discount.

Neither Separ, Nash nor Denny ever received their Elinvest certificates. Two other customers [29] also testified that they purchased Elinvest on the extravagant projections of Baron but never received their certificates.

Blitz and Orpheus each testified on his own behalf.[30] Blitz denied that he had accepted the $25,000 to cause him to purchase the Elinvest stock on behalf of the Astron Fund. Rather, he maintained that the money was merely a loan from Van Aken which Blitz needed to help his brother with some legal difficulties. Most of Orpheus' testimony was more helpful to the government's case than to his own. Horvat called George Linder as a witness. Although Linder testified that he had told Baron nothing about the market manipulation and that Baron and Horvat were not participants in the manipulation, Linder's knowledge of dealings between Baron and Van Aken was limited. Moreover, Linder's testimony was undermined by his admissions that he had received a large pay-off to find a broker to sell Duke's Elinvest stock, that he had made a substantial payment to Baron and that he had conveyed to Baron a message from Van Aken that Bradley should not sell his stock because it would dilute the Elinvest market.

## II. SUFFICIENCY OF THE EVIDENCE

■ We turn directly to the claims of Orpheus, Drew and Horvat that the evidence was insufficient to support the jury's verdict convicting them on the conspiracy and substantive counts.[31] Viewing the evidence in the light most favorable to the government, as we must, we hold that each of these claims is without merit.

We shall analyze the evidence separately in support of the conspiracy count, the stock fraud counts and the mail fraud counts and, with respect to each of these groups of counts, as applied to the three appellants who assert claims of insufficiency of the evidence to convict them.

### (A) CONSPIRACY COUNT

As our summary above shows, there was overwhelming evidence from which the jury could have found a large scale, brazen conspiracy to drive up the price of the virtually worthless Elinvest stock and to reap windfall profits for Van Aken, his fellow shareholders and a band of highly paid salesmen at the expense of innocent purchasers and public investors. While the illegality of the scheme speaks for itself, it is significant to note that the operation included a laundry list of securities law and mail fraud violations, including covert manipulation of the market, failure to disclose that a large group of persons had combined to control the stock's supply and demand, fraudulent promises of quick profits made by salesmen to friends and customers and concealment from purchasers of the fact that the salesmen were being paid large fees by Van Aken and his co-conspirators to sell the stock. In short, this was a sophisticated boiler room operation.

We proceed to an analysis of the evidence in support of the respective appellants' convictions on the conspiracy count.

### (1) *Orpheus*

At the outset we note that, although Orpheus states in his brief that there is "not one iota of evidence that [Orpheus] . . . had reason to believe other than that this was a normal stock promotion", he concedes in the same brief that Van Aken told him that "he [Van Aken] was trying to bring the price of the stock to about 7 or 8 so that he could 'bring in some institutions who would buy the stock'."

---

29. David Kaufman purchased $8,000 worth of Elinvest after Baron promised "to make [him] a lot of money". Matthew Peterson purchased 100 shares. Both made repeated demands for their certificates but never received them.

30. Orpheus and Blitz were the only defendants who testified at the trial.

31. Blitz does not claim the evidence was insufficient to convict him on the Investment Companies Act count (Count 19), the only one on which he was convicted.

Orpheus testified that he knew that the objective of the operation was to drive up the price of Elinvest. He admitted that he had participated earlier in a scheme with Santini, whom he characterized as a member of organized crime, to drive up the price of Integrated Automated stock—a scheme in which his function was to monitor the supply and demand of outstanding shares so that the market would not be diluted. Although Orpheus disputed the testimony of various government witnesses that he had "called" customers about Elinvest, he admitted the substance of Willeford's testimony that Orpheus had told Willeford that a mutual fund already had purchased 30,000 shares, that the fund was so happy with its investment that it intended to purchase another 30,000 shares at $7 and that the fund had given a tentative order to purchase more stock as high as $11, all of which was false. Orpheus also admitted that, after a week or two with the apartment group, he believed that brokers were being paid off to help raise the price of Elinvest. Orpheus further admitted that he had committed perjury before the SEC when questioned about Elinvest trading.[32]

Independent evidence, as well as Orpheus' own testimony, established that he and Santini were the ringleaders of the operations of the apartment group. Orpheus arranged for Ridgeway, McLeod & Associates to handle the group's sales. He acted as the liaison between RMA and the group. He took payments from the firm in his own name and informed McLeod of each sale the group made. While the jury was free to accept or reject Orpheus' testimony, his claim that, despite his presence in the same room where the others were selling, he was not aware of the fraudulent sales pitches that were being used strikes us as utterly incredible. This is particularly so in view of the fraudulent representations Orpheus himself had made in selling the stock in an effort to drive up the price. In addition to giving assurances of quick profits, Orpheus falsely held himself out as a RMA broker and failed to disclose to his customers the existence of the large scale manipulation or his relationship to Van Aken. Experienced in market manipulation as the result of his role in the Integrated Automated scheme, Orpheus meticulously monitored the supply and demand for Elinvest, including the repurchase of shares from market makers who became nervous about the size of their Elinvest holdings.

#### (2) Drew

Drew asserts that his participation "was limited to forcibly inducing others to sell securities". He contends that "there is an absolute dearth of evidence" that he intended to pressure the salesmen to sell fraudulently or that he knew about the fraudulent activity of the others.

Drew's claimed lack of knowledge was squarely contradicted by Pollisky's testimony that Drew, together with Santini and Gladstein, offered him a bribe of $50 for every 100 shares of Elinvest he purchased. After Pollisky had said he wanted to see financial reports on Elinvest before making any purchase, Drew, without furnishing such reports, called Pollisky and ordered him to purchase 500 shares. When Pollisky declined, Drew threatened to punch him in the mouth unless he did so.

Drew also threatened Van Aken by telling him that he would be "pushing up daisies" if he tried to throw Santini and his group out of his apartment. He also threatened to "work over" Gerstenzang unless he kept making calls to customers. Such threats bespeak something more than a desire to keep a legitimate sales operation running smoothly.

Drew made numerous visits to the apartment while the boiler room operation was going on. He accompanied Santini on sales visits to customers. In view of this activity Drew's statement to Gerstenzang that the latter was "involved with us" and "a part of the group" is particularly incriminating.

**32.** Orpheus also admitted that he knew that neither Gerstenzang nor Gladstein were licensed brokers; and that the SEC had barred Gerstenzang from selling securities.

We hold that Drew's knowing and willful participation in the conspiracy as a salesman and an enforcer was fully established.

### (3) Horvat

The evidence in support of Horvat's conviction on the conspiracy count is on a different footing from that of Orpheus and Drew. This is so because of the different role of Horvat in the conspiracy and because the evidence implicating Horvat was largely circumstantial.

Horvat claims that the evidence was insufficient to show that he knew about the Van Aken-engineered conspiracy to manipulate the price of Elinvest. He argues that the "projections" which he made to his customers were not fraudulent; but, even if they were, he contends that the evidence failed to establish that he knew that he was promoting a large stock manipulation.

In order to focus upon Horvat's role in the conspiracy, we must bear in mind that Baron & Co. was one of the principal outlets through which Elinvest shares were sold to the public. Horvat was the firm's salesman through which approximately 7,275 Elinvest shares were sold during a nine week period beginning in May 1971 and from which Horvat earned $3,635.50 in commissions. Horvat participated with Robin Baron, the principal partner of the firm, in channeling 35,000 Elinvest shares which had been in Duke's name into the hands of the firm's innocent customers and away from the public market, thus preventing the market price of the stock from being depressed. Horvat and Baron together performed a critical role necessary to the success of the overall conspiracy.

True, there was no evidence that Horvat ever met with Van Aken or members of the

apartment group, or that Horvat learned of the market manipulation other than through either Baron or Linder or both.[33] Rather, there was ample circumstantial evidence from which the jury could have found that Horvat knew or must have known of the overall conspiracy. This is understandable, since Horvat's only link with the other conspirators was through Baron and Linder.

We reject out of hand Horvat's claim that he did no more than give price projections to his customers. He solicited purchasers with *positive* assurances of *quick* profits. Such assurances could not have been based upon good faith business judgment. He knew that others were hard at work driving up the price of Elinvest.[34] Moreover, he denied before the grand jury that he had made any price projections at all. Aside from attempting to conceal his participation in the conspiracy by such false exculpatory statements, this belies his claim on appeal that all he did was give legitimate projections which were well founded on his assessment of Elinvest's future.

We find no merit moreover in Horvat's claim that the evidence, even if it established that he made fraudulent representations, did not support the inference that he knew he was part of a larger conspiracy to manipulate the price of Elinvest. Separ, who purchased Elinvest from Horvat, testified that Horvat tried to discourage him from selling his shares by telling him that he would depress the market if he did.[35] When Separ asked for his stock certificates, Baron and Horvat told him that delivery would be delayed for a while due to the paper work. Separ, as well as other Horvat customers, never received his certificates. Horvat was concerned about keeping his customers in line.[36]

---

**33.** Baron knew about the entire conspiracy from Van Aken. He had pleaded guilty to one count of securities fraud before trial.

**34.** It also is significant that Horvat made different projections to different customers. He told Separ that the stock would soon reach $10 or $12, but told others that the price would go up to $6 or $8.

**35.** Horvat could hardly have believed that he alone could keep up the price of Elinvest. Ob-

viously he knew that others who substantially controlled the Elinvest market also were striving not to dilute the market and thus artificially manipulating the price of the stock.

**36.** Significantly, Horvat testified before the grand jury that Baron told him to have his customers hold the stock, rather than resell it, so as not to depress the market. He testified that Baron told him that the reason for his concern over depressing the market was that Elinvest planned to make acquisitions with its

Furthermore, during a substantial part of the summer of 1971 Horvat earned almost all of his commissions from Elinvest. He knew that Baron & Co. was being paid 25% of the price of the stock, even though the sales were risk-free to the firm. This further undermines Horvat's claim that he did not know of the source of the firm's Elinvest shares or that Baron had become involved in an illegal scheme.[37]

Finally, the certainty with which Horvat assured his customers that the price of Elinvest was about to soar to specified levels further supports an inference that Horvat knew that the stock was being driven up artificially.

We hold that there was ample evidence from which the jury could have found that Horvat knew of the large-scale manipulation, his understanding of Baron's and his own critical roles in the scheme and his willing participation in it.[38]

## (B) SUBSTANTIVE SECURITIES AND MAIL FRAUD COUNTS

Orpheus, Drew and Horvat each was convicted on the substantive counts of securities fraud (Counts 7–13). Orpheus and Horvat each was convicted on the substantive counts of mail fraud (Counts 14–18).

The government concedes that the evidence was insufficient to support the convictions of Orpheus and Drew on Counts 7–12 for securities fraud and that the evidence was insufficient to support the conviction of Orpheus on Counts 14–17 for mail fraud. We therefore reverse their convictions on those counts.[39]

This leaves for our consideration the sufficiency of the evidence to support the convictions of Orpheus for securities fraud on Count 13 and for mail fraud on Count 18; the conviction of Drew for securities fraud on Count 13; and the convictions of Horvat for securities fraud on Counts 7–13 and for mail fraud on Counts 14–18.

For the reasons below, we hold that the evidence was sufficient under the court's charge to support the convictions of each of these appellants on each of the substantive counts before us on the ground that the fraudulent sales and mailings were made either by appellants directly or by others who were aided and abetted by appellants under 18 U.S.C. § 2 (1970).[40]

---

stock. Regardless of the purpose of the manipulation (and we note that his explanation to the grand jury differed sharply from what Horvat told Separ, see p. 1337 *supra*), clearly Horvat knew of a scheme to manipulate the Elinvest market and that the scheme could not have succeeded without the help of other persons who controlled the majority of the Elinvest shares.

37. In May 1972, Horvat testified before the SEC that he never heard of Van Aken until after he left Baron & Co. in August 1971. In May 1973, however, Horvat testified before the grand jury that he knew that Van Aken was an officer of the company which controlled Elinvest.

38. As we said in *United States v. Geaney*, 417 F.2d 1116, 1120 (2 Cir.), *cert. denied*, 397 U.S. 1028 (1969), "Pieces of evidence must be viewed not in isolation but in conjunction." See also *United States v. Calabro*, 449 F.2d 885, 890 (2 Cir. 1971), *cert. denied*, 410 U.S. 926 (1973).

39. The counts which the government concedes should be reversed were based on sales and mailings by others before Orpheus and Drew joined the conspiracy.

40. The court's aiding and abetting charge, given separately with respect to the securities fraud counts and the mail fraud counts, correctly informed the jury of the requisite elements of that offense, including knowledge and approval by each defendant whose case was under consideration of the fraudulent sales and mailings by others. This charge was in substantially the form repeatedly approved by us. See, e. g., *Wapnick v. United States*, 355 F.2d 136, 138 (2 Cir. 1966). Except for one frivolous request (that the court charge that "the defendant must have aided and abetted in some kind of a meaningful way"), there was no objection to the court's aiding and abetting charge. By its verdict, the jury found that the government had sustained its burden of proving beyond a reasonable doubt each essential element of aiding and abetting as to each count on which appellants were convicted on this theory.

Parenthetically, we note that in our view the evidence would have justified a charge under *Pinkerton v. United States*, 328 U.S. 640 (1946). See *United States v. Sperling*, 506 F.2d 1323, 1340–42 & n. 27 (2 Cir. 1974), *cert. denied*, 420 U.S. 962 (1975). In *Pinkerton*, the Supreme Court held that a defendant may be convicted of the substantive offenses committed by his co-conspirators in furtherance of a continuing

### (1) *Orpheus and Drew*

The only substantive count of securities fraud on which Orpheus and Drew were convicted which is before us is Count 13. That count involved the fraudulent sale of 200 shares of Elinvest stock by Horvat to Archibald W. Denny, Jr. on July 8, 1971. By this time Orpheus and Drew were deeply involved in the fraudulent scheme. Each participant in the scheme to drive up the price of the stock had a stake in the successful efforts of the others who were involved in creating a demand for the stock, in making sales and in discouraging customers from selling their shares for fear of depressing the market if they did.

Specifically, the efforts of Orpheus and Drew in stimulating the Elinvest market aided the efforts of the others in driving up the price of the stock. Orpheus and Drew knew that the price of the stock could not be driven up successfully within a short time without an intensive, marketwide effort. From the very nature of the scheme and their knowledge of it as detailed above, both Orpheus and Drew most assuredly knew that Van Aken was making sales on his own and that he was enlisting other brokers to do likewise.[41] Indeed, it was vital to the success of their own efforts to drive the price of the stock up that he do so. Since Orpheus and Drew necessarily knew that others would be involved in the large scale market manipulation, it is of no significance under elemental aider and abettor doctrine that they did not know the identity of Horvat as the principal (with respect to the July 8, 1971 sale) whom they were aiding and abetting. *United States v. Bradley*, 421 F.2d 924, 927 (6 Cir. 1970), and

cases there cited. See *Nye & Nissen v. United States*, 336 U.S. 613, 618–19 (1949).

The conviction of Orpheus for mail fraud charged in Count 18 was based on evidence of his direct participation in the sale of Elinvest stock to Lenore Braunfeld. The sale was made from Van Aken's apartment by Gerstenzang. Orpheus personally telephoned McLeod to alert him to contact Braunfeld and to confirm the sale to her. It is the confirmation of that sale which is the subject of Count 18. Orpheus was properly convicted under this count based on his direct participation in the transaction.

### (2) *Horvat*

Of the substantive securities fraud counts on which Horvat was convicted (Counts 7–13), three were based on sales made by Horvat himself (Counts 9, 10 and 13). These sales by Horvat involved fraudulent guarantees of quick profits and failure to disclose the existence of a large scale scheme to manipulate the price of Elinvest.

Horvat's convictions on the remaining four securities fraud counts and on the five mail fraud counts were based on his role in aiding and abetting fraudulent sales of Elinvest stock. Count 7 involved a sale by Baron to Matthew Peterson. Count 8 charged fraud in connection with the sale by Van Aken to the Astron Fund by bribing Blitz. Counts 11 and 12 involved sales made chiefly by Peter Rosenthal and executed through Rosan & Co. Count 14 involved a sale from Baron to Kaufman. Count 15 involved the sale by Van Aken to the Astron Fund. Counts 16 and 17 involved sales made through Rosan & Co. The sale charged in Count 18 is described

conspiracy if the defendant in question knew that the conspiracy might encompass such conduct, even though he did not participate in the substantive offenses or have any knowledge of them. The court in the instant case, however, refused the government's request that it charge under *Pinkerton* with respect to the substantive counts—a ruling more favorable to the defendants than the record warranted. Since the case was not submitted to the jury under *Pinkerton* but only under the aiding and abetting statute, we confine our ruling to the correctness of the

aiding and abetting charge and the sufficiency of the evidence to support the convictions upon that theory.

**41.** Both Orpheus and Drew knew that Van Aken had first invited *them* into the scheme. They also knew that Van Aken had sold 25,000 shares to the Astron Fund through Blitz and that Van Aken had enlisted Rosenthal to help sell the stock. Moreover, one of Orpheus' principal functions was to enlist other brokers to push Elinvest and to monitor its supply and demand in the market.

above. All of these sales were made long after Horvat had become deeply involved in the fraudulent scheme.

Horvat's essential claim is that, since he did not know the other participants, he could not have aided and abetted their fraudulent conduct. This is not the law. See *United States v. Bradley, supra; Nye & Nissen v. United States, supra.*

The evidence—notably the certainty with which Horvat assured his customers that the price of Elinvest would soar and his attempts to dissuade his customers from reselling their shares—clearly demonstrated Horvat's knowledge of his role in the market manipulation. Horvat could not possibly have thought that he and Baron were manipulating the market alone, for he knew that a supplier was delivering the stock to Baron & Co. and that that firm did not control the Elinvest market.[42] Horvat was no newcomer to the securities business. He knew that the success of this market manipulation, like any scheme to drive up the price of a publicly traded stock, depended upon an intensive, large-scale effort, involving as many brokers and salesmen as could be enlisted. As we pointed out in *United States v. Finkelstein*, 526 F.2d 517, 521–22 (2 Cir. 1975), a case involving a similar market manipulation:

> "The consummation of each particular fraudulent transaction . . . was dependent upon the successful exploitation of the illusion of legitimate market activity—an illusion to which each transaction contributed its share."

Under all the circumstances of the instant case, Horvat necessarily knew that there were other salesmen involved in this large scale market manipulation—unless he deliberately closed his eyes to that fact.

Horvat points out that two of the securities fraud counts on which he was convicted (Counts 11 and 12) involved sales made

through Rosan who was acquitted by the jury on all charges. The evidence, however, clearly established that Rosenthal had played the major role in soliciting each of these customers. The jury could have believed Rosan's defense that he knew nothing about the conspiracy and made no fraudulent representations. There is nothing inconsistent between Rosan's acquittal and Horvat's conviction for having aided and abetted Rosenthal's fraudulent sales or sales by Rosan to customers who did not receive full disclosure because Rosan was not told of the scheme.

We hold that the evidence was sufficient to support the convictions of Orpheus, Drew and Horvat on each of the securities fraud and mail fraud counts here under review.

### III. SEVERANCE

Blitz and Horvat claim that they were entitled to severances of their respective cases under Fed.R.Crim.P. 14.[43]

■ We summarily reject Horvat's severance claim since we have held that there was sufficient evidence to sustain his conviction on the conspiracy count which charged a single conspiracy. *United States v. Sperling*, 506 F.2d 1323, 1342 (2 Cir. 1974), *cert. denied*, 420 U.S. 962 (1975); *United States v. Bynum*, 485 F.2d 490, 497 (2 Cir. 1973), *vacated and remanded on other grounds*, 417 U.S. 903 (1974). And of course the relationship between the stock fraud and mail fraud counts on which he also was convicted and the conspiracy count was such as to present no joinder problem.

■ Blitz' severance claim is on a different footing since he was acquitted by the jury on the stock fraud and mail fraud counts and the court dismissed the conspiracy count as against him at the close of all of the evidence. He was convicted only on

---

**42.** Horvat also knew that Baron & Co. was receiving a $1 pay-off, or 25% of the sales price, for each share sold, even though marketing the stock involved no risk to the firm. It is also noteworthy that Horvat's grand jury testimony directly contradicted his claim before the

SEC that he had never heard of Van Aken. See note 37 *supra.*

**43.** Blitz also urges that his joinder was improper under Fed.R.Crim.P. 8(b). This is but a corollary to his Rule 14 claim.

Count 19 of accepting a bribe for the purchase of property in violation of the Investment Companies Act.

Blitz argues that the government had no evidence that he accepted the bribe from Van Aken with knowledge of the overall conspiracy to manipulate the price of Elinvest. Blitz contends that the government joined him with the others in bad faith since it knew that Van Aken had testified at an earlier trial involving a similar scheme that Blitz was unaware of the market manipulations in which Van Aken was involved.

In view of the evidence summarized above, we hold that there was a sufficient basis for the government in good faith to have believed that it could prove that Blitz, who had been paid a $25,000 bribe to cause the fund to purchase Elinvest stock and who knew Van Aken from past dealings, thought that he was the "unloading" part of a larger conspiracy to manipulate the price of Elinvest when he took the bribe.

Moreover, Blitz has failed to show any prejudice from his joinder. Even if the $25,000 payment to him for buying the stock for his mutual fund was a "loan" as he asserts, it nevertheless was a thing of value proscribed by the Investment Companies Act. See p. 1345 *infra*. The factual and legal issues involved in Count 19 were easily and effectively isolated from the other issues in the case. The court, in marshalling the evidence in its charge, carefully distinguished Blitz' case from those of the other defendants. The conspiracy count as against Blitz was not submitted to the jury. And the jury acquitted him on all counts that were submitted except Count 19.

We hold that the court did not abuse its discretion in denying Blitz' motions for severance and for a new trial based on improper joinder. *United States v. Miley,* 513 F.2d 1191, 1209 (2 Cir.), *cert. denied,* 423 U.S. 842 (1975); *United States v. Sperling, supra,* 506 F.2d at 1342.

## IV. GRAND JURY EVIDENCE

Blitz and Horvat attack the procedure by which the instant indictment, which superseded an earlier indictment, was returned.

■ Blitz and Horvat contend that a government attorney improperly took the witness stand and read to the second grand jury testimony from the first grand jury proceedings; and that some of the testimony read to the second grand jury was incompetent because it had been presented to the first grand jury after the expiration of its term. Blitz claims that the government improperly failed to read to the grand jury that returned the instant indictment his own grand jury testimony in an unrelated case; and that the evidence before the second grand jury was insufficient to support the indictment as to him.

The short answer to these claims is that they have been waived, since neither Blitz nor Horvat raised them before trial as required by Fed.R.Crim.P. 12(b)(2).[44]

■ Moreover, the claims are without merit. Even if some of the testimony read to the second grand jury had been received by the first grand jury after the expiration of its term, see *United States v. Fein,* 405 F.2d 1170 (2 Cir. 1974), and therefore was hearsay, ". . . an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. . . ." *United States v. Calandra,* 414 U.S. 338, 345 (1974). See *United States v. James,* 493 F.2d 323, 326, and cases there cited (2 Cir.), *cert. denied,* 419 U.S. 849 (1974).

■ Mindful of our concern that a prosecutor shall not put into issue at trial his credibility or professional integrity, *United States v. Spangelet,* 258 F.2d 338, 342–43 (2 Cir. 1958), we hold here that the prosecutor did not place his credibility on the line with the ministerial act of reading prior testimony to the grand jury any more than when counsel reads at trial properly admitted prior testimony, whether in the form of a

44. Indeed, Horvat raised his claims for the first time after trial.

deposition, grand jury testimony or otherwise.

Finally, we find too frivolous to warrant discussion Blitz' claim regarding the government's failure to read to the instant grand jury that indicted him his prior testimony before an unrelated grand jury, as well as his claim that there was insufficient evidence to warrant the indictment against him.

## V. CHARGE AND EVIDENTIARY RULINGS

Blitz, Drew and Orpheus claim error in the court's charge as given, in the court's refusal to charge as requested and in certain evidentiary rulings by the court.

■ In its charge on Count 19, the court told the jury that it could convict Blitz if it found that he had accepted any form of compensation in return for causing the Astron Fund to purchase Elinvest stock. Blitz argues that the jury was misled into believing that it could convict Blitz even if it found that Van Aken had merely made a loan to Blitz to induce him to make the purchase.

The court clearly charged the jury that, whatever the form of compensation, it could convict Blitz only if the compensation was in return for Blitz' causing the fund to make the purchase. As a matter of law, it was immaterial whether the bribe was in the form of a loan or some other form of compensation, *United States v. Deutsch,* 451 F.2d 98, 114–15 (2 Cir. 1971), *cert. denied,* 404 U.S. 1019 (1972), provided the jury found under the court's charge each of the requisite elements of a violation of Section 17(e)(1) of the Investment Companies Act.[45]

■ Orpheus claims that the trial judge should have granted his request to charge that market making, in itself, was a legitimate function. Our careful examination of the charge as a whole, given at the end of a five week trial and immediately following lengthy summations by counsel, leaves us with the firm conviction that the court clearly separated for the jury the fraudulent from the legitimate market activities and correctly defined the proper basis upon which the jury could convict each of the respective defendants. More than this was not required under the circumstances.

■ Drew claims that the court improperly allowed the jury to consider against him certain grand jury testimony by Orpheus that Drew had received money from Santini for the sale of some Elinvest shares. Since Orpheus testified at trial and was available for cross-examination, and since his trial testimony was inconsistent with his grand jury testimony, we hold that the jury properly was permitted to consider the evidence in question in the case against Drew. *United States v. Ellis,* 461 F.2d 962, 969 (2 Cir.), *cert. denied,* 409 U.S. 866 (1972); *United States v. DeSisto,* 329 F.2d 929, 932–34 (2 Cir.), *cert. denied,* 377 U.S. 979 (1964). See also Rule 801(d)(1) of the Federal Rules of Evidence.

■ Orpheus also challenges the admission of Willeford's testimony of conversations he had with Orpheus over the telephone for lack of a proper foundation to show that Willeford could identify Orpheus' voice over the telephone. In asserting this claim, Orpheus ignores that portion of his grand jury testimony received in evidence in which he admitted speaking with Willeford over the telephone and Orpheus' admission at trial to having spoken with Willeford on the telephone. This surely provided more than an adequate basis for the jury to accept Willeford's identification of Orpheus as the speaker in the conversations to which Willeford testified. *United States v. Zane,* 495 F.2d 683, 697–98 (2 Cir.), *cert. denied,* 419 U.S. 895 (1974).

We have carefully examined appellants' other claims of error and find them to be without merit. We order that the mandate issue forthwith.

---

**45.** Cf. *United States v. Roth,* 333 F.2d 450, 453–54 (2 Cir.), *cert. denied,* 380 U.S. 942 (1965), where the same problem was considered with respect to similar statutory language in Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186(a) (1970).

To summarize:

We affirm the convictions of Orpheus on Counts 1, 13 and 18; of Drew on Counts 1 and 13; of Horvat on Counts 1 and 7–18; and of Blitz on Count 19.

We reverse, pursuant to the government's concession, the convictions of Orpheus on Counts 7–12 and 14–17; and of Drew on Counts 7–12.[46]

Affirmed in part; reversed in part.

MANSFIELD, Circuit Judge (concurring and dissenting):

I concur in Judge Timbers' thoughtful opinion in this complex securities fraud case except for its affirmance of the convictions of certain defendants (Drew, Orpheus and Horvat) as aiders and abettors of the commission of certain frauds by others. Since this seems to me to stretch the aiding and abetting concept too far I would reverse the convictions on these counts.[1]

As Judge Timbers accurately observes, there was ample evidence to support a conviction of all defendants as members of one conspiracy consisting of a combination of several groups, each manipulating Elinvest stock as part of a scheme devised by the central figure in the conspiracy, Van Aken. However, when it comes to the specific substantive crime alleged in each of these counts (see fn. 1), there was no evidence that the alleged aider and abettor knew of the fraudulent transaction, or even of the existence of the other group, much less of the member of that group who acted as the principal in committing the criminal act. For instance there was no evidence that Orpheus, who was in the "Apartment Group," knew of Baron & Co. and Horvat, or of their sales.

I accept the proposition advanced on the basis of *United States v. Bradley,* 421 F.2d 924, 927 (6th Cir. 1970), that a person need not have been introduced to a principal to be guilty of aiding and abetting his criminal conduct. But implicit in the concept of aiding, abetting, commanding, counselling, assisting or advising is an understanding by the defendant that he is helping someone else to commit a crime. At least this seems to me to be assumed in Judge Learned Hand's famous definition of aiding and abetting in *United States v. Peoni,* 100 F.2d 401 (2d Cir. 1938), which has for years been almost verbatim the standard boilerplate charge on the subject. In *Bradley,* for instance, the defendant engaged in conduct obviously intended to assist someone in robbing a bank. And in *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919, 925 (1949), the jury could have inferred that since the defendant had concocted the criminal scheme he aided and abetted the crimes committed by his business subordinates in carrying it out. But it seems to me to place an undue strain on the concept to reason that, once a general conspiracy is shown, a minor or subordinate member who commits some act in furtherance of it thereby becomes an aider and abettor of parallel conduct of which he was unaware on the part of another member whose existence is unknown to him, merely because he should have reasonably foreseen that his conduct might assist others to commit such acts. Although such a foreseeability test might provide a basis for tort liability, see *United States v. Greer,* 467 F.2d

---

**46.** We are mindful that, in an appropriate case where concurrent sentences have been imposed and some but not all counts are reversed, we have remanded for reconsideration of the sentences imposed on the counts which are affirmed. *United States v. Sperling,* 506 F.2d 1323, 1343 (2 Cir. 1974), *cert. denied,* 420 U.S. 962 (1975). In the instant case, however, with respect to the counts which we reverse pursuant to the government's concession, *suspended sentences* were imposed on Drew on Counts 7–12 and *imposition of sentence was suspended* as to Orpheus on Counts 7-12 and 14-17. Moreover, the sentences imposed on the af-

firmed counts were exceedingly light. Under these circumstances, we hold that it is neither necessary nor appropriate to remand for reconsideration of sentence.

**1.** The particular counts I would reverse are the convictions of Drew and Orpheus on Count 13 (securities fraud) for aiding and abetting a sale by Horvat, and the convictions of Horvat on Counts 8, 11 and 12 (securities fraud), and 15 through 18 (mail fraud) for aiding and abetting various sales made by Van Aken, Rosan & Co., or the "Apartment Group."

1064, 1068–69 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), the relationship strikes me as too attenuated to support a criminal conviction on the theory of aiding and abetting. Cf. *United States v. Jackson,* 526 F.2d 1236, 1238 (5th Cir. 1976). Under this theory a minor figure could be penalized for the acts of others over whom he had no control and with whom he had no real connection, merely because they were members of a broad, loosely-knit conspiracy.

I appreciate that, as Judge Timbers has noted, the trial judge might have instructed the jury pursuant to *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that a member of the conspiracy might be convicted of substantive offenses committed by others in furtherance of the conspiracy. This naturally leads one to ask whether, since these defendants might have been convicted of substantive offenses under *Pinkerton,* it should matter that they were convicted as aiders and abettors. The answer is that, regardless of whether it may be advisable to reconcile the two doctrines, it is unwise to pervert one merely because of the existence of the other. Since a *Pinkerton* charge was refused and we do not know what result the jury would have reached if one had been given, we cannot uphold the convictions on that basis. This very point was made in *Nye & Nissen v. United States, supra,* 336 U.S. at 618–22, 69 S.Ct. at 769–771, 93 L.Ed. at 924–926, where the Court, in upholding the conviction of the defendant as an aider and abettor, made it clear that it could not be upheld on the basis of *Pinkerton* because that theory had not been charged.